El Pueblo de Puerto Rico, demandante y apelado, *v.* Elifáz Escobar, acusado y apelante.

Núm. 7501.—*Sometido:* Mayo 11, 1939. *Resuelto:* Julio 29, 1939.

*Miguel Bahamonde, E. Huertas Zayas, Frank Torres, Luis Noriega y Agustín E. Font,* abogados del apelante; *R. A. Gómez, Fiscal,* abogado de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR HUTCHISON emitió la opinión del tribunal.

Nueve reos acusados de asesinato en primer grado comparecieron por sus abogados y solicitaron un pliego de particulares en que se especificara la participación de cada acusado en el delito imputádole. Se señala como error el haberse declarado sin lugar esta moción.

En la acusación se alega que los referidos acusados, nombrándoles:

"En ocasión en que se celebraba una parada en esta ciudad de Ponce, conmemorando el cuadragésimo aniversario de la entrada del Ejército de los Estados Unidos de América en la Isla de Puerto Rico, al mando del General Nelson A. Miles, estando el Hon. Blanton Winship, Gobernador de P. R., en una plataforma, frente a la Casa Consistorial de Ponce, acompañado del señor Enrique de Orbeta, Coronel de la Policía Insular de P. R., del señor Luis A. Irizarry, Coronel de la Guardia Nacional de P. R., . . . . que conjuntamente con el Hon. Blanton Winship, Gobernador de P. R., en dicha plataforma observaban el desfile de la parada que se celebraba, allí y entonces, ilegal, voluntaria y criminalmente, con malicia, premeditación, deliberación y propósito firme y decidido de dar muerte ilegal al ser humano, Hon. Blanton Winship, Gobernador de P. R., y mediante acecho, escondiéndose detrás del público, que, a corta distancia, frente a la referida plataforma, observaba igualmente el desfile de dicha parada, y haciendo uso de revólveres, armas mortíferas, acometieron al Hon. Blanton Winship, haciéndole numerosos disparos, hiriendo con uno de ellos en el pecho al ser humano Luis A. Irizarry, Coronel de la Guardia Nacional de P. R., y atravesándole la arteria y la vena pulmonar, a consecuencia de lo cual falleció dicho Luis A. Irizarry horas después."

La corte inferior actuó acertadamente al declarar sin lugar la moción.

■ El·segundo señalamiento es que la corte de distrito cometió error al declarar sin lugar la moción de Escobar solicitando la posposición del juicio a fin de que su abogado pudiera prepararse para el mismo. No era la primera vez que se solicitaba la suspensión. Todos los acusados habían comparecido el 4 de agosto de 1938 representados por su abogado Miguel Bahamonde, quien manifestó al tribunal que representaba a los acusados tan sólo para la lectura de la acusación, mas aseguró a la corte que los acusados estarían representados por letrado y solicitó se le concediera un término para contestar la acusación. La corte concedió a los acusados hasta el 9 de agosto para que pudieran hacer la alegación correspondiente y señaló el mismo día para la vista de cualquier cuestión legal que ellos pudieran suscitar. El juez de distrito al resolver la segunda moción sobre posposición del juicio, fechada el 23 de agosto, manifestó que:

En agosto 9 compareció uno de los acusados por su abogado Nelson Colberg y los otros ocho por su abogado, Bahamonde. Todos alegaron ser inocentes y solicitaron juicio por jurado, reservándose el derecho a solicitar juicios por separado. La corte, habiendo sido informada que los acusados no habían hallado abogados que los representaran, designó entonces a los letrados Miguel Bahamonde, Felipe Colón y E. Huertas Zayas como abogados de los acusados, sin perjuicio de que éstos utilizaran otros abogados, y señaló el 22 de agosto para el juicio. Colón y Huertas Zayas renunciaron. La corte aceptó la excusa de Colón por hallarse enfermo el día 10 de agosto, pero rechazó la de Huertas Zayas, agregando los nombres de Agustín E. Font, Frank Torres, Luciano Colón, Luis A. Noriega y Ramón Goyco, sin perjuicio de los derechos de los acusados·a elegir sus propios letrados. Los abogados así nombrados, con excepción de Font, se hallaban presentes y la corte ordenó se notificara a Font de su nombramiento. Al siguiente día, o sea el 11 de agosto; Goyco renunció y el 12 Luciano Colón y Luis A. Noriega también renunciaron. Al mismo tiempo Font presentó una moción en que aducía ciertas cuestiones de ética profesional, sus deberes como abogado, y la ley, y solicitaba se consultara a los acusados respecto a si éstos aceptaban su nombramiento y hacía constar que en todo caso él cumpliría con la obligación impuéstale por el juramento que había

prestado al ser admitido al ejercicio de la abogacía. En una vista celebrada el 15 de agosto, la corte, que había aceptado la renuncia de Goyco, también aceptó la de Luciano Colón, mas se negó a aceptar la de Noriega. En dicha ocasión el Lic. Baigés Gómez compareció a nombre del acusado Vicente Morcigglio Figueroa, ratificó su alegación de inocencia y solicitó juicio por jurado separadamente. El día 15 de agosto Font solicitó la posposición del caso, a lo cual se avino el fiscal, y entonces el caso, que ya se había fijado para el 22 de agosto, fué nuevamente señalado para el 29 del referido mes. Ninguno de los letrados presentes se opuso a que se señalara el 29 de agosto para la celebración del juicio y al siguiente día, 16 de agosto, todos los abogados designados por la corte aceptaron su nombramiento y cada uno de los acusados solicitó juicio por jurado separadamente. El 17 de agosto el fiscal solicitó que subsistiera el 29 de agosto como el día señalado para el juicio de Elifaz Escobar. Un recurso de hábeas corpus que había sido presentado era un asunto muy sencillo que sólo envolvía la cuestión de fianza excesiva, y Escobar, que habría de ser juzgado separadamente el 29 de agosto, estaba representado por los cinco letrados originalmente designados para asumir la defensa de siete de los acusados. A uno de los letrados de Escobar se le había asignado el estudio de la cuestión legal envuelta en una moción de traslado que se proponían radicar, pero dicha moción no se había presentado no obstante haberse discutido plenamente la cuestión en tres casos ya resueltos por el Tribunal Supremo. *Pueblo* v. *Mateo Fajardo*, *Pueblo* v. *Collazo* y *Pueblo* v. *Baerga*. Los hechos envueltos en el único caso citado por los letrados del acusado en apoyo de su moción para que se pospusiera el caso—*Pueblo* v. *Arrocho y Clemente*—eran muy distintos a los del presente caso. El caso se había señalado para juicio desde el 9 de agosto. Ésa era la segunda moción de suspensión que se presentaba. El acusado estaba representado por cinco letrados y, tomando todo en consideración, la prórroga ya concedida, incluyendo los cinco días que faltaban para la celebración del juicio, era un término razonable para preparar su defensa.

La moción solicitando la posposición de la vista, al igual que aquélla en que se solicitaba un pliego de particulares, iba dirigida a la sana discreción de la corte inferior, y no hallamos que se abusara de esa discreción.

■ El tercer señalamiento es que la corte de distrito cometió error al declarar sin lugar una moción de traslado

presentada el 27 de agosto. La moción se basaba en los siguientes fundamentos:

(a) Que no podía obtenerse un juicio justo e imparcial en el Distrito de Ponce.

(b) Que la vida de un testigo se ponía en peligro si se juzgaba la causa en ese Distrito.

(c) Que sería imposible obtener un jurado imparcial y exento de prejuicio.

La moción de traslado, al igual que la moción solicitando un pliego de particulares y la moción para que se pospusiera la vista del caso, iban dirigidas a la sana discreción de la corte inferior. Hemos examinado la moción y las declaraciones juradas en apoyo de la misma, así como los fundamentos por los cuales los fiscales se opusieron a la moción y. las contradeclaraciones en apoyo de tal oposición. El testigo cuya vida se decía peligraba era un testigo de cargo. Durante la vista de la moción salió a relucir que la persona que había amenazado de muerte a este testigo se hallaba en la cárcel y que cualquier daño que pudiera inferirse al testigo por el hecho de declarar durante el juicio sería el mismo, no importa el distrito donde se prestara tal declaración. No se experimentó gran dificultad en obtener un jurado imparcial y exento de prejuicio, y el acusado, en nuestra opinión, tuvo un juicio justo e imparcial. No hallamos que la corte inferior abusara de su discreción al declarar sin lugar la moción.

■ En el cuarto señalamiento se ataca la desinsaculación de los miembros del jurado que debían formar el *panel,* "a espaldas del acusado, sin estar presente dicho acusado, y sin habérsele notificado que tal acto iba a realizarse."

Al preguntársele a las partes si estaban listas para entrar a juicio, la representación del acusado anunció su intención de impugnar el *panel* por los motivos indicados en este señalamiento. Al pedirle la corte que especificara el artículo que exigía la presencia del acusado, el letrado dijo: "Creemos que es parte del juicio y el acusado tiene derecho a estar presente." El juez indicó que se habían seguido los artículos

199 *et seq.* del Código de Enjuiciamiento Criminal y que estos artículos no exigían la presencia del fiscal o de los abogados defensores. La objeción fué declarada sin lugar y el acusado se anotó una excepción.

De conformidad con el artículo 212 del Código de Enjuiciamiento Criminal:

"Sólo puede fundarse la recusación de todo el jurado en que los procedimientos se hayan desviado considerablemente de las prácticas prescritas para el sorteo y formación de la lista de jurados, o en que se haya omitido citar intencionalmente a uno o más de los jurados sorteados."

La argumentación en el alegato del apelante agrega muy poco o nada a la creencia del letrado tal como la misma fué expresada al tiempo de levantar esta cuestión en la corte de distrito. Las únicas autoridades citadas son: *Pueblo* v. *Vázquez*, 20 D.P.R. 361, y *Pueblo* v. *Ramos*, 36 D.P.R. 821. Nada hallamos en ninguno de estos casos que sostenga la contención del apelante. Nuestra conclusión es que la contención carece de mérito.

Los señalamientos quinto y sexto se refieren a la negativa de la corte a conceder ciertas recusaciones motivadas.

El examen de uno de los miembros del jurado—Rangel—cubre unas ocho páginas de los autos escritas a máquina. En respuesta a una pregunta hecha por los letrados de la defensa, Rangel dijo que había leído algo en los periódicos acerca del acusado, que había oído algunos comentarios acerca de él y que tenía opinión formada. En respuesta a las preguntas héchasle por el fiscal el declarante manifestó que:

En el momento de los disparos se hallaba en la esquina de las calles Sol y Salud. Nada vió y nada sabía de propio conocimiento. Lo que sabía sobre el caso era lo que había leído en los periódicos; no había hablado con ninguno de los testigos de cargo; no sabía cuál sería su testimonio; su opinión la había formado de lo que había leído en los periódicos; si la prueba presentada era contraria a la opinión que él

se había formado, traería un veredicto de acuerdo con las declaraciones de los testigos.

En respuesta a ulteriores preguntas héchasle por la defensa Rangel dijo:

Que si la prueba presentada coincidía con los informes de la prensa, él tenía ya opinión formada; que él estaba en la parada.

Los letrados de la defensa renovaron su recusación motivada, por dos fundamentos, primero, porque el declarante había manifestado que estaba en la parada, y segundo, porque tenía opinión formada. El juez de distrito se negó a aceptar la recusación porque si bien el declarante estaba en la parada, se hallaba sin embargo en la esquina de las calles Sol y Salud, a unos seis bloques de distancia de la escena de los sucesos y porque el declarante había manifestado que no había visto nada y que cambiaría de criterio de acuerdo con la prueba que se presentara.

Perfecto Herrera era comerciante. Solicitó su exención antes de que se le examinara respecto a sus condiciones para servir como jurado. En respuesta a preguntas héchasle por la defensa, dijo que era un hombre ocupado; que prestaba atención constante a su negocio; que si el juicio duraba tres o cuatro días estaría preocupado; que podía llegar el momento en que él sólo pensaría sobre su negocio; que esto le impediría apreciar la prueba debidamente; que estaría con la mente preocupada.

Preguntado por el fiscal si su preocupación le impediría rendir un veredicto imparcial respecto a la culpabilidad o inocencia del acusado, o si al llegar a su decisión él tomaría en consideración su negocio, el testigo contestó que ninguna de esas dos cosas tenía que ver con la otra; que su decisión se basaría en la prueba.

No hallamos abuso de discreción al negarse la corte a aceptar las recusaciones motivadas.

El séptimo señalamiento es que la corte de distrito cometió error al permitir que el fiscal ejerciera su derecho a

recusar perentoriamente luego de haber dejado de ejercitar ese derecho en su oportunidad.

En apoyo de su contención el apelante copia de los autos los siguientes extractos:

"Fiscal: Nada más. Perentoria ninguna.

"Defensa: Desearía preguntar a la corte cuál es el *ruling*.

"Juez: El *ruling* es el de siempre para casos de asesinato y hasta que se tome el juramento final, las partes pueden hacer sus recusaciones perentorias.

"Defensa: Ninguna por ahora.

.    .    .    .    .    .    .    .

"Juez: Perentorias del fiscal.

"Fiscal: Ninguna.

"Juez: Perentorias de la defensa.

"Defensa: Deseo consultarle al fiscal. Si la defensa dijera que no tiene ninguna, que no tiene recusaciones perentorias, quizá si ellos no van a hacer ninguna, quedaría definitivamente constituído el jurado.

"Fiscal: Su Sa. tengo que consultar con el compañero también, a ver si estamos en condiciones de aceptar el jurado.

.    .    .    .    .    .    .    .

"Juez: El fiscal.

"Fiscal: Nada.

"Juez: Perentorias del fiscal.

"Fiscal: Ninguna.

"Defensa: Ninguna por ahora.

"Fiscal: Esta situación no puede subsistir. La defensa no puede estar diciendo siempre 'ninguna por ahora' cuando se le pregunta. Vamos a recusar perentoriamente al joven de Adjuntas. A este señor.

"Juez: Puede retirarse. Complétese el jurado.

.    .    .    .    .    .    .    .

"Juez: Perentoria del fiscal.

"Fiscal: Ninguna por ahora.

"Defensa: Ninguna por ahora. Se acepta el jurado.

"Juez: Fiscal.

"Fiscal: Ninguna por ahora.

"Juez: ¿Se acepta el jurado por las partes?

"Defensa: La iniciativa es del fiscal.

"Juez: ¿Perentoria o se acepta el jurado? Para hacerle la misma pregunta a la defensa.

"Fiscal: Recusamos al señor Domenech perentoriamente.

.        .        .        .        .        .        .        .

"Fiscal: Ninguna motivada. Aceptamos el jurado.

"Juez: La defensa.

"Defensa: Nosotros no aceptamos el jurado, para ser congruentes con varias cuestiones de derecho que hemos presentado."

Posiblemente, aunque tal vez no, el fiscal o los letrados de la defensa, o ambos, trataban de obtener una ventaja indebida. De ser así, ninguno tuvo éxito. Hasta qué límite deben tolerarse tales tácticas es cuestión que descansa en gran parte en la sana discreción del juez sentenciador. No hallamos que se abusara de esa discreción, que se perjudicara al acusado en un derecho substancial, ni tal irregularidad en los procedimientos que exija la revocación.

◾ El octavo señalamiento es que la corte de distrito erró al permitir que un testigo, Julio M. Conesa, declarara respecto a una herida recibida por él y mostrara la herida al jurado. Conesa se hallaba en el templete en el momento de los disparos. Su declaración fué sustancialmente como sigue:

Se hallaba cerca del centro del templete, como a tres o cuatro pies del Gobernador. Había mucha gente en el templete—más de 150 personas. La parada empezó a cruzar como a las 11:07. Mientras la bandera y los soldados del Regimiento 165 pasaban frente al templete hubo tres o cuatro disparos, inmediatamente seguidos de un tiroteo cerrado, como de ametralladoras. Salían disparos por todos sitios. El testigo creyó que se había insubordinado todo el pueblo, todos los habitantes. Nunca se imaginó que sólo fueran tres o cuatro personas. Ésa fué su impresión de momento. El primer disparo fué por su derecha, casi por detrás de un poste eléctrico, por su derecha estando el testigo de frente. Entonces el testigo vió un resplandor y algo parecido a humo por el otro lado. Los primeros dos disparos, el testigo vió a alguien disparar del otro lado como a una distancia de diez pies. El testigo vió dos resplandores y al principio creyó

que estaban tomando fotografías,. puesto que vió algo como un relámpago, como si muchos fotógrafos estuvieran retratando. Entonces abrieron fuego desde el centro. El testigo vió personas con revólveres disparando desde el centro. Vió por lo menos de seis a siete personas disparando. Un segundo antes, al mismo tiempo, el testigo pudo identificar un individuo que estaba a su derecha, era Elifaz Escobar. El testigo fué herido en el cuello.

Al pedírsele al testigo que mostrara la herida al jurado, el letrado de la defensa se opuso fundado en que no se estaba juzgando al acusado por haber herido al testigo sino por la muerte de un ser humano. El fiscal contestó que era parte del *res gestae* y que ello tendía a aclarar y explicar los hechos. La corte declaró sin lugar la objeción y el acusado se anotó una excepción. El testigo entonces mostró la herida al jurado.

No hubo objeción alguna a la declaración de este testigo. El mostrarse la herida tan sólo tendía a corroborar las manifestaciones del testigo. Una lectura de la opinión emitida por este tribunal en el caso de *El Pueblo* v. *Rodríguez,* 33 D.P.R. 478, que es el único caso citado por el apelante, bastará para distinguirlo. Por otra parte, véase *State* v. *Parr,* 246 S.W. 905, citado por el fiscal de este tribunal y *Pueblo* v. *Philip,* 34 D.P.R. 644. El error, de serlo, al permitir que Conesa mostrara la herida al jurado, no sería suficiente motivo para la revocación.

■■ Los señalamientos noveno y décimo son que la corte cometió error al negarse a exigir que se presentara la declaración anterior prestada por Conesa ante el fiscal, cuya presentación requería la defensa con el propósito de impugnar al testigo, y al permitir que el fiscal preguntara sobre hechos relacionados con otros delitos de que el apelante había estado acusado.

En el curso de un extenso contrainterrogatorio Conesa había dicho repetidas veces que no se acordaba que él hubiese prestado declaración ante el fiscal. Hacia el final de este contrainterrogatorio, ocurrió el siguiente incidente:

"¿Usted dice, sin embargo, que cuando sintió la descarga salió del templete para salvarse?

"Sí, señor.

"¿No se acuerda cuándo usted declaró?

"No me acuerdo haber declarado. Si le digo que me acuerdo estoy mintiendo.

"¿Usted le dijo a alguna persona que había visto a este acusado?

"No hablé con nadie.

"¿Cuándo ha dicho por primera vez que usted ha visto a este acusado?

"Varias veces.

"(Pierluisi)—Es inmaterial eso de que cuándo fué la primera vez que lo haya dicho. ¿Qué tiene que ver eso? Si el compañero tiene prueba de que el testigo ha hecho manifestaciones, que la presente, para luego de sentada esa base, proceder a impugnar al testigo.

"(Font)—Que resuelva la corte si se puede hacer la pregunta.

"(Juez)—Ya el testigo la ha contestado.

"(Font)—¿Cuándo fué la primera vez . . . ?

"(Juez)—Con lugar la objeción del fiscal en cuanto a esa nueva pregunta. El testigo ya ha dicho varias veces que no recuerda haber declarado al fiscal.

"(Font)—Tomamos excepción de la resolución de la corte, y solicitamos de la Corte que ordene al fiscal que produzca a la defensa la declaración que haya prestado este testigo sobre esta cuestión, con el propósito de impugnarlo, ya que éste es el único medio de que puede valerse la defensa para hacer tal impugnación. Cuando se está celebrando un juicio no se debe ocultar nada y debe presentarse todo a la justicia en bien de la justicia misma.

"(Pierluisi)—Eso no merece discusión. Me extraña que el compañero Font, ex fiscal, diga eso.

"(Juez)—Con lugar la oposición.

"(Font)—Tomamos excepción, fundándonos en que la negativa de la corte impide a la defensa sentar las bases . . . .

"(Juez)—Ante la corte no hay pruebas de que el testigo haya prestado tal declaración, si es que ha declarado."

El juez estuvo enteramente correcto al decir que no había nada ante la corte que demostrase que el testigo había declarado ante el fiscal. Si el testigo en realidad había prestado declaración ante el fiscal, y si ésta constaba por escrito, nada

impedía que el abogado estableciera ese hecho por otros medios que no fuera la repregunta. Más tarde en la misma repregunta Conesa admitió haber hablado con el fiscal pero el letrado no le preguntó si su declaración había sido escrita, ni repitió su petición para que se presentara cualquier declaración jurada que se hubiese prestado. Pueden o no surgir casos en que la negativa del fiscal a presentar declaraciones juradas prestadas ante él, o la negativa del juez de distrito a ordenar tal presentación sería suficiente fundamento para la revocación. Éste no es uno de esos casos.

■ Anteriormente, en el curso de la repregunta, Conesa había declarado que:

Él vió varias personas disparando. El único que él conocía era el acusado. Vió otros, pero no los identificó. Él podía identificar al acusado porque estaba mirando para donde él estaba. Él había visto a alguien que se parecía mucho al acusado, si no era el acusado, era su doble. Después que pasaron los colores, el testigo vió al acusado disparar. El testigo no conocía al acusado. Él lo había visto pero no lo conocía.

En este punto de su declaración se le preguntó al testigo dónde había visto al acusado y contestó: "Cuando los procesos de los nacionalistas."

En el examen redirecto el fiscal le preguntó a Conesa si él había sido testigo de "este acusado" en el caso "del 21 de marzo." El abogado del acusado se opuso por el fundamento de que Conesa era un testigo de cargo y que el fiscal había terminado su examen directo y no podía continuar el mismo sin permiso de la corte. Otra objeción fué que la pregunta era irrelevante porque se refería a otro caso. El fiscal dijo que era una pregunta propia porque la defensa había tratado de arrojar dudas sobre el testimonio de Conesa, y el objeto de la pregunta era demostrar que el testigo no estaba prejuiciado, sino que simplemente estaba declarando lo que sabía en torno al caso. El juez denegó la objeción y la defensa tomó excepción. El fiscal entonces le preguntó a Conesa si él había sido un testigo de "este acusado" en rela-

ción con lo que había ocurrido en Ponce el 21 de marzo, y el testigo contestó en la afirmativa. La defensa pidió que se eliminara todo el testimonio relativo al otro caso, porque ese testimonio tendería a prejuiciar la mente del jurado y era impertinente e innecesario. El caso de *El Pueblo* v. *Rodríguez* se citó y se discutió en apoyo de esta contención. El juez dijo que él creía que la evidencia era admisible porque el mismo acusado estaba envuelto. La defensa tomó excepción. El juez dijo que al acusado se le había absuelto. El abogado de la defensa manifestó que el fiscal debía dirigir su propio caso. El juez dijo que la corte podía hacer preguntas aclaratorias y explicó que como el abogado había hablado de cierto asunto y no lo había expuesto claramente —como se dijo (en el caso de Rodríguez) se presentó evidencia para demostrar que la asamblea municipal había destituído un miembro de la misma—la corte quería explicar el resultado de aquel caso. El abogado contestó que el fundamento de la objeción era que de todas maneras, aunque al acusado se le había absuelto, hechos irrelevantes se habían traído a conocimiento del jurado, ya que se les diría que el acusado había sido procesado. El juez indicó que el testigo, en la repregunta, había declarado que él conocía al acusado porque el testigo había intervenido en el proceso nacionalista, y en el examen redirecto el fiscal podía investigar el mismo asunto. El abogado de la defensa renovó su objeción y dijo que la pregunta en el contrainterrogatorio se había limitado a si el testigo conocía al acusado y que el testigo contestó que lo había conocido en un juicio anterior, pero que el testigo no había dicho que lo conociera como acusado. El testigo puede haber visto al acusado en cualquier otro sitio, pero no puede admitirse, como quiere ahora el fiscal, que de una manera afirmativa asegure que fué testigo de la defensa. Esto llevaría a la mente del jurado la impresión de que el acusado había sido procesado en otro caso. El fiscal preguntó entonces al testigo si el acusado había salido absuelto en el otro caso y contestó en la afirmativa. El abogado defen-

sor solicitó que la pregunta y la contestación se consideraran como permitidas por encima de la objeción del acusado.

El fiscal ha debido darse cuenta de que estaba al borde de una zona peligrosa cuando preguntó a Conesa si él había sido testigo de "este acusado" en relación con lo que había ocurrido en Ponce el 21 de marzo. Él pudo haber evitado la posibilidad de una seria controversia en una moción para nuevo juicio o en apelación resistiendo la tentación de hacer esa pregunta, o no insistiendo en hacerla en vista de la objeción. Las razones expuestas por el fiscal no fueron muy persuasivas y el resultado hubiera sido más satisfactorio si el juez hubiera declarado la objeción con lugar. Sin embargo, el juez mismo finalmente salvó la situación, llamando la atención al hecho de que el testigo había mencionado el caso anterior en el curso de la repregunta. No es necesario que especulemos respecto a cuál hubiera sido el resultado en cuanto se refiere a este aspecto de la cuestión. El abogado de la defensa había sacado a relucir en el curso de la repregunta el hecho de que Conesa podía identificar al acusado desde la época del caso anterior. Al hacer esto ofreció la oportunidad y el fiscal se aprovechó de ella.

El juez inferior tiene alguna discreción para determinar el alcance tanto del examen redirecto como de la repregunta. No estamos preparados para decir que él abusó de esa discreción al permitir que el fiscal investigara en el examen redirecto si Conesa había comparecido como testigo de Escobar en el caso anterior ya mencionado por Conesa en el curso de su contrainterrogatorio. En éste, así como en el octavo señalamiento, una lectura de la opinión en el caso de *El Pueblo* v. *Rodríguez,* 33 D.P.R. 478, sería suficiente para distinguir ese caso.

El undécimo señalamiento es que la corte de distrito erró al no permitir que se hiciera cierta pregunta en el contrainterrogatorio al testigo Luis Germán Toro. Después de una serie de preguntas que no tenían relación con la materia cubierta en el examen directo, se le preguntó al testigo con

quién había trabajado. durante los cuatro años que él había vivido en Ponce y contestó que había trabajado por su cuenta; que había tenido negocios. Cuando se le preguntó "qué negocios", el fiscal se opuso fundándose en que esta materia no había sido objeto del examen directo y que la pregunta era impertinente e irrelevante. El letrado defensor sometió la cuestión a la corte sin explicación ni argumento alguno, y el juez preguntó cuál era el propósito de la pregunta. El abogado contestó que el objeto era que el jurado supiera la parcialidad de este testigo. El juez le permitió continuar. El abogado repitió una pregunta anterior sobre cuánto tiempo hacía que el testigo estaba en Ponce y el testigo repitió su contestación anterior al efecto de que él había vivido en Ponce cuatro años. El abogado preguntó otra vez qué había hecho el testigo en Ponce y éste contestó que al principio había trabajado en el Departamento de Sanidad; que luego había renunciado y se había dedicado a negocios de automóviles.

El abogado entonces le preguntó al testigo si él no había trabajado en la pasada campaña electoral. El fiscal se opuso, basándose en que la pregunta era irrelevante. El juez declaró con lugar la objeción y el letrado de la defensa tomó excepción, sin expresar los fundamentos de la misma.

Quizá la mejor práctica hubiera sido permitir algunas preguntas sobre este particular. Hasta este punto, sin embargo, la repregunta había sido una pérdida de tiempo en cuanto al supuesto propósito del abogado, y debe existir algún límite. Aquí tampoco encontramos abuso de discreción.

Los señalamientos de error duodécimo y décimo-tercero son que la corte de distrito erró: al no permitir repreguntar al testigo Modesti con el propósito de impugnarlo; al permitir preguntas sobre una conspiración que no se alegaba en la acusación, y al permitir al testigo Chardón que declarara en cuanto a manifestaciones hechas por otra persona que no era el acusado.

El duodécimo señalamiento, según aparece en el alegato, no requiere seria consideración.

La parte pertinente del testimonio de Chardón es como sigue:

A las cinco de la tarde del 24, el día antes de los disparos, López de Victoria, uno de los acusados, habló con el testigo. El testigo conocía a López de Victoria. Era nacionalista. Era capitán de los cadetes. A instancias de López de Victoria, el testigo fué a la plaza de Las Delicias a las diez de la mañana, donde se encontró con un grupo de nacionalistas frente al Café Plaza. Entre ellos estaban López de Victoria, Pietri, Elifaz Escobar y González. El tema de su conversación era que sabían que el Gobernador venía a la parada con un pecherín de acero y que López de Victoria situaría a los acusados en cierto sitio donde pudiesen disparar a la cara del Gobernador. López de Victoria dió instrucciones de disparar a la cara del Gobernador. Dió esas instrucciones porque decía que el Gobernador venía con un pecherín de acero. Dió esas instrucciones a Elifaz Escobar, Pietri, González y otros de la Isla a quienes el testigo reconocería si se trajesen ante él. En el momento en que la parada desfilaba ante el templete, tomó su puesto cerca de unas bombas de luz y entonces se retiró hacia el fondo, hacia otra bomba de luz. El testigo estaba tres o cuatro metros detrás de él. Entonces dió órdenes de que cuando pasase la bandera, como el Gobernador estaba parado, debían dispararle. Dió esa orden a Elifaz Escobar, Pietri, González y otros de la Isla. Él dijo que debían dispararle al Gobernador de Puerto Rico. Los acusados dispararon. Elifaz Escobar disparó.

La mayor parte de este testimonio fué admitida a pesar de la oposición del abogado del acusado, quien tomó excepción a las resoluciones de la corte.

El apelante, en apoyo de su contención bajo el señalamiento de error número 12, cita:

*Ivans* v. *People,* 90 Ill. 384;

*People* v. *Richards,* 67 Cal. 412;

*Pueblo* v. *Rivera Esbri,* 26 D.P.R. 571;

*Pueblo* v. *Pérez,* 27 D.P.R. 752;

*Pueblo* v. *Torrellas,* 10 D.P.R. 542.

Estos casos hablan por sí solos. El quid del argumento es como sigue:

Por analogía, una conspiración no puede probarse bajo una acusación que imputa el delito específico de asesinato. La evidencia sobre conspiración no tenía peso en lo concerniente a los actos criminales constitutivos del delito de asesinato. Siendo esto así, debe presumirse que el propósito del fiscal era crear una influencia o presunción. A todas luces la evidencia era impertinente y perjudicial a los derechos sustanciales del acusado, ya que independientemente del resto de la evidencia, podía crear un prejuicio o probabilidad de culpabilidad en las mentes del jurado. Así, pues, no debió presentarse la evidencia por el fiscal y no debió ésta haberse admitido por la corte. *Pueblo* v. *Rodríguez,* 33 D.P.R. 478.

Es una regla general que todo acusado tiene derecho a contrainterrogar los testigos presentados en su contra. Al testigo se le permitió declarar sobre manifestaciones hechas por López de Victoria, que no era el acusado, y a quien éste no podía repreguntar. El acusado, habiendo sido privado de su derecho a contrainterrogar y a investigar, fué también privado de su derecho a un juicio justo e imparcial.

Una contestación suficiente a la primera parte de este argumento puede hallarse en 2 *Warren on Homicide* 133, sección 182, citado por el fiscal de esta corte. Allí encontramos lo siguiente:

"Cuando una acusación imputa al acusado y a sus coacusados conjuntamente el haber cometido el delito de asesinato, eso es suficiente para autorizar al estado a introducir cualquier evidencia competente en relación con una conspiración, tal como dicha conspiración ha sido sustentada por la acusación, aun cuando haya una ausencia absoluta de alegación de conspiración en la acusación con respecto al acusado apelante. Tal acusación, que conjuntamente le imputa a varios acusados el delito de asesinato, implica en sí y lleva consigo una conspiración."

En lo que se refiere a su última parte, bastaría decir que López de Victoria era un coacusado y coconspirador y sus manifestaciones fueron hechas en presencia del acusado. Además, el testimonio de Chardón en cuanto a las declaracio-

nes de López de Victoria no se ofreció con el propósito de establecer la verdad de ninguna manifestación hecha por López de Victoria, sino más bien con el propósito de establecer el hecho de que había expresado tales manifestaciones, o de que él había fraguado el plan y dado las instrucciones contenidas en dichas manifestaciones, y había explicado los motivos que tuvo para dar dichas instrucciones. Por lo tanto, las declaraciones no eran prueba de referencia.

El décimocuarto señalamiento es al efecto de que la corte cometió error al no permitir una pregunta en el contrainterrogatorio coartando así el derecho de repregunta que tiene todo acusado. Este error lo somete el apelante por los fundamentos previamente aducidos en apoyo de los señalamientos números 11 y 12. En su consecuencia, no es necesario discutirlos separadamente.

El décimoquinto señalamiento es que la corte cometió error al negarse a ordenar un receso para que la defensa pudiese examinar ciertos documentos antes de empezar el contrainterrogatorio del testigo Francisco Rivera.

Para sostener este señalamiento, el apelante se limita a citar del caso de *El Pueblo* v. *Arrocho,* 33 D.P.R. 657, lo siguiente:

"La justicia exige y es además la regla general que una persona acusada de un delito debe dársele un tiempo razonable para preparar su defensa; pues si la regla fuera otra, el derecho del acusado a un juicio justo e imparcial sería a menudo destruído . . . .

". . . Gran deliberación, una ausencia absoluta de precipitación debió haber caracterizado cada actuación de la corte hasta el momento de la condena. 'La ley camina con pie de plomo pero da con mano de hierro.' . . . "

Del récord taquigráfico tomamos el siguiente extracto:

"(Juez)—Repregunta.

"(Font)—Antes de preguntarle al testigo, para pedir que se le entregue a la defensa un artículo de Edgar Hoover de la 'F. B. I.' sobre esta materia. ¿Ustedes no reciben un *magazine* sobre esta materia?

"(Rodríguez Serra)—Me voy a oponer. No ha sido materia de interrogatorio directo el contenido de ese *magazine*. Además el compañero ha aceptado la capacidad del perito.

"(Font)—Es una pregunta para solicitar formalmente que se nos entregue ese artículo. Es el mismo que anteriormente se trajo a corte.

"(Juez)—¿No hay objeción?

"(Rodríguez Serra)—Nos oponemos.

"(Font)—Entonces pediría, para que sea más limpio el procedimiento, un receso formalmente de la Corte para poder ver ese artículo para poder contrainterrogar al experto, ya que hemos citado al perito Monclova, quien no ha venido todavía. No ha venido todavía y no sé si ha sido citado por el márshal.

"(Juez)—La Corte ordenó que se le expidieran las citaciones y la defensa dijo que ellos tramitarían las citaciones.

"(Font)—Hay una equivocación. Creo que ha habido un error en el cual somos culpables.

"(Juez)—Se expidieron las citaciones y tengo la impresión de que las mismas quedaron en las manos del Lic. Bahamonde.

"(Font)—Ha habido un error en el cual incurrimos. La Corte está justificada en lo que dice. Todos de buena fe creíamos que había sido cierto. Ésa es la situación nuestra, y naturalmente tratándose de esta materia pediríamos un receso para examinar ciertos documentos para poder contrainterrogar al testigo.

"(Pierluisi)—Nosotros entendemos que la defensa sabía que se iba a utilizar prueba pericial. Nosotros lo habíamos anunciado. La defensa debió haber estado preparada con sus papeles, para que los fiscales y la corte no sean los que tengan que suministrarle los documentos y pruebas que necesite la defensa para interrogar a un testigo. Eso es tardío y a la vez improcedente.

"(Juez)—Con lugar la objeción.

"(Font)—Respetuosamente tomamos excepción. . . . ''

En ausencia de una demostración más fuerte al efecto de por qué los letrados no estaban listos para contrainterrogar al testigo, la corte no cometió error al negarse a ordenar un receso.

El décimosexto señalamiento es que la corte cometió error al negarse a permitir una pregunta en el contrainterrogatorio al testigo Francisco Rivera. La cuestión se somete con una simple referencia al argumento aducido en apoyo de los seña-

lamientos de error números 11 y 12. No requiere una discusión por separado.

El décimoséptimo señalamiento es que la corte cometió error al desestimar una moción de *nonsuit*. La moción era solicitando la absolución perentoria.

La teoría de la moción, como se presentó en el alegato del apelante, era que—aunque Escobar había estado presente y había disparado algunos tiros, y aun cuando se le había causado la muerte a Irizarry—nada había que demostrase que la muerte de Irizarry había sido causada por los tiros disparados por Escobar *o por cualquiera de los acusados* mencionados en la acusación. La moción, según fué presentada originalmente, si no ignoraba la responsabilidad de Escobar por los disparos hechos por sus coacusados, por lo menos no hacía mención específica de la falta de prueba en cuanto a la conexión causal entre los disparos hechos por los otros acusados y la muerte de Irizarry. La contención de que la prueba no demostraba que la muerte de Irizarry fué el resultado de disparos hechos por alguno de los acusados, fué más o menos definitivamente presentada como réplica al argumento del fiscal en oposición a la moción. Ni en la argumentación ante la corte de distrito ni en el alegato del apelante, encontramos indicación alguna respecto a qué ha podido causar la muerte de Irizarry, de no haber sido causada por alguno de los disparos hechos por Escobar o por alguno de los coacusados.

La prueba tendió a demostrar que Escobar y los otros acusados disparaban desde la calle al Gobernador, quien se hallaba en el templete con Irizarry y otros. En ausencia de algo que demuestre que se hicieron otros disparos desde la calle, excepto aquéllos hechos por Escobar y sus coacusados, la cuestión referente a cualquier duda razonable en cuanto a si la muerte de Irizarry fué resultado de los disparos hechos por Escobar o por alguno de los coacusados, era cuestión a decidir por el jurado. La moción fué debidamente declarada sin lugar.

El décimoctavo señalamiento es que la corte erró al transmitir instrucciones al jurado.

Primeramente el apelante se queja de la cláusula final en la siguiente oración:

"La primera instrucción de ley que debo daros, es que es vuestro deber resolver sobre la culpabilidad o inocencia de este acusado Elifaz Escobar de acuerdo con la prueba presentada durante estos días, pero debido a la naturaleza de la acusación que incluye a varias personas, además de este coacusado, de la misma prueba ha tenido que surgir la intervención que los coacusados han podido tener respectivamente y aunque haya prueba en el sentido de que uno de los que intervino haya muerto, y me refiero específicamente a Antongiorgi, *también la prueba tiende a demostrar que los acusados tuvieron intervención en este asunto.*"

La contención es que la corte asumió las facultades del jurado al decirles que la prueba tendía a demostrar que "los acusados tuvieron intervención en este asunto." Esta contención no merece seria consideración.

En otro respecto el juez dijo:

"La deliberación significa un estado de serenidad y sangre fría; no significa calcular o reflexionar durante mucho tiempo, sino una intención o propósito de matar ejecutado por el acusado en un estado de serenidad, como consecuencia del deliberado propósito de satisfacer una pasión o venganza, o para ejecutar cualquier otro acto ilegal. Es suficiente que el designio de matar existiese cuando se produjo la herida mortal. La deliberación y premeditación dependen de las circunstancias del caso y el hecho de apuntar y disparar un arma de fuego contra una persona y matarla, es bastante para que exista la deliberación y premeditación, sin que obste para ello la rapidez con que el acto se haya realizado. *Pueblo* v. *Ortiz,* 18 D.P.R. 834."

El apelante se queja de la aseveración de que "es suficiente que el designio de matar existiese cuando se produjo la herida mortal." La contención es que esta instrucción asume que el acusado o alguno de los otros nombrados en la acusación causó las heridas, cuando no hay prueba para establecer ese hecho. Esta contención carece igualmente de mérito.

Otro motivo de queja es que el juez, en el curso de sus instrucciones, varias veces dijo que "la evidencia tiende a demostrar", etc. Se arguye que con el uso de esa expresión se invadían las facultades del jurado en cuanto a la apreciación de la prueba. No estamos de acuerdo.

El juez también transmitió la siguiente instrucción al jurado:

"Cuando un acusado y otros conspiran para quitarle la vida a una persona, y todos ellos le disparan, el acusado puede ser condenado, aun cuando el tiro que él disparó no hiciera blanco y no contribuyera a la muerte de la víctima."

La objeción a este respecto es que el juez estaba instruyendo en cuanto a una conspiración, aunque en la acusación no se alegaba conspiración alguna. Ésta es la misma cuestión discutida y resuelta bajo el señalamiento décimotercero.

En las instrucciones aparecen dos párrafos que dicen como sigue:

"Se ha dicho, señores del jurado, por el abogado defensor en su informe, que la declaración de Chardón debe considerarse como la declaración de un cómplice, y que necesita corroboración. Ésa es la ley.

"Si consideráis por la apreciación que hagáis de la prueba, que Chardón era cómplice de los demás acusados, es vuestro deber examinar la prueba, para ver si eliminando lo que ha dicho Chardón en cuanto a la participación de este acusado, llegáis a la conclusión de que los hechos imputados han sido corroborados. Ésa es la fórmula que se sugiere. Eliminar del caso la evidencia del cómplice y examinar la evidencia del otro testigo o testigos, para determinar si hay prueba inculpadora tendiente a conectar al acusado con el delito. Si existe esa prueba, la manifestación del cómplice ha sido corroborada y *debe dársele todo el valor probatorio que merezca.* Si no existe ninguna prueba inculpadora independiente, no hay corroboración aunque el cómplice pueda ser inculpado. Si ustedes encuentran que eliminando la prueba de Chardón, existe prueba en este caso, que tienda a demostrar que el acusado cometió este hecho, entonces la declaración de Chardón está corroborada, y *es vuestro deber darle todo el valor probatorio a esa declaración.* La única declaración de Chardón no sería suficiente para condenar al acusado."

La objeción es que el juez de nuevo invadió las facultades del jurado al decirles: "es vuestro deber darle todo el valor probatorio a esa declaración." La oración objetada es sustancialmente una repetición de lo que el juez acababa de decir, a saber: "Si existe esa prueba, la manifestación del cómplice ha sido corroborada *y debe dársele todo el valor probatorio que merezca.*" (Bastardillas nuestras.) No tenemos razón para inferir que el jurado fuese inducido a error.

Otros dos párrafos de las instrucciones dicen:

"En cuanto a la instrucción marcada con el número nueve, la corte instruye a los señores del jurado que la ley es que el acusado no está obligado a presentar prueba para probar su inocencia, y que es el deber del fiscal probar la culpabilidad del acusado fuera de toda duda razonable. Aquí terminan las instrucciones solicitadas por la defensa.

"Es presunción de ley, señores del jurado, que cuando cualquier parte anuncia una prueba y después no la presenta, la presunción de ley es que de haber presentado esa prueba le hubiera sido adversa."

La objeción del apelante va dirigida al segundo e ignora el primero de estos dos párrafos. El segundo debe ser interpretado a la luz del primero. Cuando el acusado tomó excepción al segundo de estos dos párrafos, el juez de distrito dijo: "No me refiero al acusado, sino en términos generales, e hice constar que el acusado no tiene que presentar prueba alguna."

No es probable que el jurado hubiese interpretado el segundo de estos párrafos como que se refería al hecho de que la defensa no había presentado prueba alguna. De todas maneras, la explicación ofrecida por el juez en presencia del jurado fué suficiente para disipar cualquier duda que el jurado pudiese haber tenido en cuanto a su significado. Además, el juez siguió instruyendo al jurado como sigue:

"Deseo asimismo aclarar la instrucción anterior que hice, en el sentido de decirles que cuando una parte ofrece prueba y después no la presenta, la presunción es que de haberla presentado le sería adversa, a petición de la defensa debo deciros que toca al fiscal pro-

bar su caso contra el acusado sin que éste tenga que presentar prueba alguna."

Otro párrafo de las instrucciones dice lo siguiente:

"Por la prueba presentada y dentro de las facultades que me da la ley para interpretar la prueba en relación con las instrucciones, y porque asimismo lo ha solicitado la defensa, debo deciros que los únicos veredictos que caben aquí, son dos veredictos, el de asesinato en primer grado o el de no culpable. En otras palabras, si ustedes consideran probados los hechos mencionados en la acusación, es vuestro deber declarar al acusado culpable del delito de asesinato en primer grado, y si consideran que no fueron probados debidamente esos hechos, o si tienen duda razonable, entonces es vuestro deber declarar al acusado no culpable y absolverlo. Los señores del jurado pueden declarar al acusado Elifaz Escobar culpable de asesinato en primer grado o no culpable, si consideran que él no tuvo participación alguna en los hechos según se alegan en la acusación y según han expresado los testigos que han desfilado, o si tienen duda razonable de que él haya tenido participación en los hechos, es vuestro deber declararlo no culpable."

Es improbable que el juez quisiese decir que la defensa había solicitado la instrucción específica dada en el párrafo que acabamos de copiar. Cualquiera que sea el significado de la frase "y porque asimismo lo ha solicitado la defensa," la instrucción en sí era correcta y el error, si lo hubo, no sería motivo suficiente para una revocación.

La instrucción en cuanto a la supresión de evidencia y la referente a conspiración fueron las únicas hacia las cuales se llamó la atención de la corte mediante excepción específica.

El Juez rehusó transmitir dos instrucciones especiales solicitadas por el acusado. Eran como sigue:

"Señores del jurado: Si de la apreciación que hagáis de la prueba resulta que no se ha probado que el acusado Elifaz Escobar, o ninguno otro de los coacusados, hayan perpetrado el acto físico (el disparo fatal), al Gobernador; o el acto físico (el disparo fatal) que ocasionó la muerte del Coronel Irizarry, es vuestro deber absolver a este acusado.

"Señores del jurado: Si después de apreciar toda la prueba, tenéis duda razonable sobre si el acusado Elifaz Escobar, o cuales-

quiera otro de los coacusados, cometieron el acto físico, el disparo al Gobernador; o el acto físico (el disparo) que ocasionó la muerte del Coronel Irizarry, es asimismo deber de los señores del Jurado absolverlo.''

Nos parece que estas instrucciones, en tanto en cuanto eran propias, fueron incluídas en las instrucciones generales. Si se hubieran transmitido en la forma en que se le sometieron a la corte, podían haber tendido a confundir la mente del jurado. De seguro que no hubieran aclarado en nada las instrucciones ya transmitidas. El juez no cometió error al rehusar transmitirlas.

▆▆▆ También el juez denegó una moción para nuevo juicio.

La moción se basaba en los siguientes fundamentos:

''(a) Por haber cometido error la Corte denegando la moción sobre *Bill* de Particulares.

''(b) Por haber denegado la Corte la suspensión del caso, según la moción radicada en agosto de 1938, y asimismo por haber denegado la suspensión solicitada el día señalado para la vista.

''(c) Por haber cometido error la Corte denegando la moción interesando el traslado del caso para otro distrito.

''(d) Por haber cometido error la Corte permitiéndole hacer al Fiscal recusaciones perentorias después de haber renunciado a ellas sin haber existido motivo fundamental que justificara tal regla de procedimiento.

''(e) Por haberse trasmitido al Jurado instrucciones erróneas que afectaban fundamentalmente el derecho del acusado.

''(f) Por haberle transmitido la Corte erróneamente instrucciones al Jurado después de estar éste deliberando, sin que tales instrucciones hubieran sido solicitadas por el jurado ni por las partes.

''(g) Por haber permitido erróneamente la Corte la declaración del cómplice (el testigo Chardón) sin que tal declaración fuera corroborada, y sobre todo, cuando tal testimonio expresaba manifestaciones de otro coacusado, infringiéndose el derecho del acusado a repreguntar a los testigos en su contra.

''(h) Por haberse permitido prueba al Fiscal sobre la reputación del acusado, sin haberla puesto en *issue* la defensa.

''(i) Por ser el veredicto contrario a derecho y a la prueba.''

Estas cuestiones han sido cubiertas y resueltas por lo que hemos dicho, o, en la forma en que el apelante las expone en su alegato, no requieren mayor discusión.

La última contención del apelante es que el veredicto es contrario a la prueba. En apoyo de la misma el apelante se conforma con decir que: "No habiéndose demostrado con la prueba que ni el acusado ni ninguno de los otros coacusados realizó el acto físico del disparo que ocasionó la muerte del interfecto, faltó un elemento esencial para perfeccionar el cargo y, naturalmente, el veredicto fué contrario a la prueba." Ésta, desde luego, es la misma cuestión que surgió de la moción de absolución perentoria y no requiere más discusión.

*Debe confirmarse la sentencia apelada.*

El Juez Asociado Sr. Travieso no intervino.