EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* LUIS NICOLE, acusado y apelante.

Núms. 14758–14760.—*Sometido:* Noviembre 6, 1950. *Resuelto:* Noviembre 22, 1950.

---

([2]) *Cf. Pueblo* v. *Díaz,* 60 D.P.R. 844; *Pueblo* v. *Sánchez,* 60 D.P.R. 964 (*per curiam*).

867

*Ildefonso Freyre,* abogado del apelante; *Hon. Procurador General Vicente Géigel Polanco, J. Rivera Barreras, Fiscal del Tribunal Supremo* y *Frank Vizcarrondo Vivas, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR SNYDER emitió la opinión del tribunal.

Se acusó a Luis Nicole de asesinato en primer grado porque "actuando de común acuerdo y con un propósito y designio común con Agustín Escapa Rivera" dió muerte a Eduardo Figueroa Rivera. Se acusó también al apelante de otros dos delitos: (1) atentado a la vida de Julio Lacourt y (2) portar armas prohibidas. Por estipulación de las partes los casos se vieron conjuntamente. El acusado fué declarado culpable por el jurado de asesinato en segundo grado y de atentado a la vida. También por la misma prueba la corte inferior lo declaró culpable de portar armas. El acusado ha apelado contra sentencias que le impusieron de 10 a 15 años de presidio, de 1 a 3 años de presidio, y 3 meses de cárcel, por los respectivos delitos de los cuales fué convicto.

Consideraremos primeramente la contención del apelante de que los veredictos fueron contrarios a la prueba y a derecho. Este error exige que hagamos una síntesis de la prueba pertinente.

*Salustiano Tirado* declaró que Escapa, Figueroa y el acusado se encontraban en su restaurante entre 10 y 10:30 de la noche en que ocurrieron los hechos en este caso; que Escapa estaba bastante picado y mostraba un revólver al testigo y le dijo que él tenía que matar a Lacourt aquella noche o Lacourt lo mataría a él; que el acusado le dijo que no debía hacer eso; y que el testigo cerró su restaurante como a esa hora y los otros tres hombres se fueron para el malecón.

*Julio Rodríguez Nazario* declaró que era sereno de Romaguera & Cía. en el malecón; que se encontraba como a cien metros de éste y que una cerca de alambres separaba los dos lugares; que a las 11:05 de la noche en cuestión, oyó al

acusado, a Lacourt, a Figueroa y a Escapa, quienes se hallaban como a diez pies del portón del muelle, hablando en voz alta; que Lacourt, Figueroa y Escapa "se emborujaron"; que Figueroa cayó al suelo y Lacourt y Escapa continuaron peleando; que el acusado se encontraba un poco retirado de los otros tres, como a diez pies; que el testigo vió entonces al acusado buscando algo en el suelo; que entonces vió que el acusado tenía algo que brillaba en las manos, y en un instante el testigo oyó cinco o seis tiros; que cuando los oyó, el acusado estaba al pie de donde estaba Figueroa tirado en el suelo; que él vió a Figueroa caer, y sintió a éste caer cuando oyó los tiros; que cuando Nicole se enderezó le vió algo en sus manos que brillaba.

*Benito Pérez Cory*, otro sereno de muelle, declaró que cuando oyó los tiros, corrió al sitio y encontró a Figueroa y a Lacourt en el suelo uno junto al otro, y que el acusado estaba como a diez pies de ellos; que el acusado corrió hacia la calle Concordia; que el testigo fué entonces donde estaba Figueroa y le preguntó qué había pasado, pero éste no pudo contestar; que preguntó entonces a Lacourt lo mismo y éste le dijo que el acusado y Escapa les habían entrado a tiros.

*Antonio Castro* declaró que al siguiente día, mientras ayudaba a la policía a buscar, encontró en el agua a orillas del mar un revólver calibre .32, niquelado, de cañón corto y con seis casquillos disparados. Se estipuló que este revólver aparecía inscrito a nombre de Escapa.

*Arnaldo Bruckman*, un detective que llegó al sitio de los sucesos poco después del tiroteo, encontró a Figueroa moribundo, y encontró debajo de su cuerpo un revólver niquelado calibre .38 con seis balas sin disparar, y otro revólver negro calibre .38 con seis balas sin disparar como a cinco o seis pies de Figueroa. No hay controversia en cuanto a que estos revólveres .38 son de la clase que de ordinario usaban los serenos, Figueroa y Lacourt.

*Sergio Merle*, otro detective, declaró que él fué a arrestar

al acusado en su casa como a la 1 de la mañana, después del suceso; que el acusado le dijo que tuviera calma, que él sabía para lo que era; que el acusado preguntó por Escapa; que el acusado le dijo que buscara por las piedras, al lado del malecón; que el testigo llevó al acusado al cuartel de la policía y fué entonces al muelle; que mientras buscaba por el sitio que el acusado le había indicado, encontró un par de espejuelos, su cartuchera, una gorra, un sombrero y un revólver niquelado calibre .32 con cachas de nácar; que cuando encontró el revólver, éste tenía cuatro balas disparadas y una sin disparar; que lo encontró como a uno o dos pies del sombrero y los espejuelos.

*Ricardo Martínez*, el primer testigo de la defensa, declaró que estaba trabajando en los muelles el día de los hechos; que Escapa, Secretario Financiero de la Unión de Trabajadores de Muelle de Mayagüez, estaba a cargo ese día de llamar la lista rotativa de los trabajadores del muelle a nombre de la unión, en ausencia del acusado, presidente de la misma, que de ordinario hacía este trabajo; que Escapa vino a chequear el personal como a las 4 de la tarde; que él entró por el almacén del muelle y cuando regresaba, Lacourt, el sereno, le dijo que no podía pasar por allí; que Escapa se sintió ofendido; que él iba en una bicicleta y se apeó y se le quedó mirando a Lacourt y que Lacourt le dijo entonces a Escapa que si le había estado mal que lo esperara en el portón, que él salía a las once de la noche; que Escapa se echó a llorar.

En la repregunta, Martínez declaró que cuando ocurrieron los hechos de este caso, el acusado era Presidente de la unión de la cual Escapa era secretario financiero y que el testigo era secretario de récord; que el día en cuestión vió al acusado como a las 10:15 de la noche, luego de haber éste regresado a Mayagüez de San Juan; que él estaba con Escapa en dicho día en un café desde las 6 hasta las 11 de la noche; y que el acusado también se dió dos o tres tragos con ellos.

*Jacinto Ortiz* declaró que la noche de los hechos Figueroa

lo relevó a él, entregándole a Figueroa su revólver, de acuerdo con lo acostumbrado.

*Pedro Zapata*, trabajador en los muelles, declaró en cuanto a la amistad que existía entre el acusado y Figueroa y el acusado y Lacourt.

*Pedro Pérez*, estibador de azúcar, declaró que vió al acusado, a Figueroa y a Escapa saliendo del cafetín de Tirado como de 10:30 a 11 de la noche; que oyó al acusado y a Figueroa decirle a Escapa que dejara esas cosas, que no le convenían por ser padre de familia; y que Escapa decía que era una cosa inevitable porque él había sido ofendido.

*Luis Nicole*, el acusado, declaró en su propia defensa que era un viejo amigo tanto de Figueroa como de Lacourt; que cuando regresó de San Juan la noche en cuestión, fué a un café donde encontró a Martínez y a Escapa bebiendo; que se dió un trago con Escapa, quien estaba bastante borracho; que Figueroa pasó por allí hacia su trabajo y el acusado se fué con él hacia el muelle para ver si como presidente de la unión era necesario que él relevara a algunos de los trabajadores; que cuando él y Figueroa se acercaron al cafetín de Tirado, llegó Escapa en un automóvil, bajándose e invitándolos a darse un trago; que entraron al cafetín de Tirado; que el acusado no quería llegar al muelle borracho, de manera que se echó su trago a la boca y lo fué a botar a la parte de atrás del cafetín; que cuando regresó, oyó que Escapa le decía a Figueroa que había tenido una cuestión en el muelle y que esa noche la iba a resolver aunque le costara la vida; que Figueroa le preguntó con quién había tenido el asunto y que Escapa le dijo que con Lacourt; que entonces Figueroa y el acusado aconsejaron a Escapa que se olvidara del asunto ya que era padre de familia; que ellos salieron del cafetín y él y Figueroa continuaron tratando de persuadir a Escapa que se olvidara del asunto; que antes de llegar al muelle, lo convencieron de que virara hacia atrás; que él y Figueroa continuaron hacia el muelle; que Figueroa se fué a trabajar y el acusado fué al barco a ver si los hombres

estaban todavía trabajando allí; que cuando regresaban hacia el portón para irse a su casa, oyó una discusión y al salir afuera encontró a Escapa y a Lacourt discutiendo y Figueroa en el medio; que Figueroa le dijo a Lacourt, "dame el revólver, no te vayas a llevar ese revólver, dame el revólver"; que entonces Lacourt le dió el revólver a Figueroa y le dijo que no lo necesitaba; que Escapa entonces disparó un tiro, cayendo Figueroa al suelo, y entonces Lacourt sacó un revólver "y hubo un montón de disparos"; que al ocurrir estos disparos el acusado estaba como a diez o doce pies de retirado; que él se dobló para evitar ser herido; que empezó a gritar porque después de los tiros Lacourt y Escapa "se emborujaron"; que cada cual agarraba la mano del otro en la que portaba el revólver y continuaron peleando hasta que llegaron a la orilla del mar, cuando se cayó el revólver de Lacourt; que continuaron peleando en el mar y Lacourt sumergió a Escapa; que al ver esto, al acusado le dió tanto pavor que se cayó y se le cayeron los espejuelos y el sombrero, y que el acusado se levantó y echó a correr.

El testimonio médico demostró que Figueroa murió a consecuencia de heridas de bala; que Escapa pereció ahogado; y que Lacourt recibió varias heridas de bala. (¹)

██ Creemos que los autos contienen suficiente evidencia para sostener la conclusión a que llegó el jurado de que el acusado, presidente de la unión, participó junto a Escapa, secretario financiero de la unión, en el esfuerzo de éste para vengarse de Lacourt, sereno del muelle, porque Lacourt había supuestamente humillado a Escapa ese día mientras Escapa desempeñaba temporeramente los deberes que como oficial de la unión el acusado realizaba normalmente. La prueba del acusado al efecto de que el único papel suyo en el asunto fué tratar de disuadir a Escapa de su propósito, no fué creída por el jurado. No vemos base para inter-

---

(¹) Los autos demuestran que Lacourt falleció con anterioridad al juicio y por tanto, no declaró como testigo. Sin embargo, no hay evidencia de la causa de su muerte y el recurso ante nos en cuanto a él envuelve solamente una acusación de atentado a la vida.

venir con la actuación del jurado al resolver este conflicto en la evidencia.

Además, como las balas en los revólveres .38 se encontraron sin disparar, mientras que los revólveres .32 se encontraron como ya se ha dicho, la teoría del acusado requeriría que encontráramos probado que Escapa disparó seis balas y Lacourt cuatro, cada uno con un revólver .32. (Esto a pesar del hecho de que Lacourt de ordinario portaba un revólver .38 que el propio acusado declaró Lacourt ya le había dado a Figueroa.) Sin embargo, Escapa no fué herido de bala, Figueroa recibió una herida y Lacourt tres. Esto querría decir que Lacourt, un sereno que presumiblemente estaba acostumbrado a usar armas de fuego, no hizo blanco en Escapa con sus cuatro tiros, mientras que Escapa, que estaba borracho, hirió a Lacourt tres veces y a Figueroa, una vez con sus seis tiros. Contra esta teoría, rechazada por el jurado, la evidencia fué suficiente para que éste concluyera que las únicas dos personas que dispararon fueron Escapa y· el acusado, y que uno de los tiros mató a Figueroa y tres de ellos hirieron a Lacourt. No es necesario que determinemos cuál de los tiros mató a Figueroa y cuál hirió a Lacourt. Una vez establecido a satisfacción del jurado que el acusado participó en el ataque junto con Escapa, ambos eran igualmente responsables por las heridas y muerte causadas por los varios disparos. *Pueblo* v. *Escobar*, 55 D.P.R. 505, 526; 1 Warren, *Homicide*, Perm. ed., pág. 232.

██ El apelante se queja luego de la resolución denegando su moción solicitando un pliego de particulares. Dicha moción solicitaba particulares en cuanto a lo· siguiente: (1) el alegado propósito y designio común con Escapa y la participación del acusado en los mismos; (2) si el disparo que ocasionó la muerte a Figueroa se le imputaba al acusado o a Escapa.

Si se ordena o no un pliego de particulares es una cuestión de discreción de la corte sentenciadora. Solamente si los autos demuestran que al denegar los mismos se privó al

acusado de preparar debidamente su defensa estaríamos justificados al decir que la corte inferior abusó de su discreción al denegar la moción. *Pueblo* v. *Santos*, 69 D.P.R. 441 y casos citados. En vista de la imputación de participación común y del hecho de que Escapa y el acusado serían ambos culpables, independientemente de quién de hecho hizo el disparo fatal, no podemos decir que los derechos del acusado fueron perjudicados sustancialmente por haberse denegado su moción para un pliego de particulares. Véase *Pueblo* v. *Escobar*, supra.

■■ El acusado también señala como error la actuación de la corte inferior al permitir al fiscal contrainterrogar a Ricardo Martínez, uno de los testigos de la defensa, en cuanto a hechos nuevos y situaciones distintas que no surgieron del interrogatorio directo de dicho testigo. La posición del acusado es que Martínez testificó en el interrogatorio solamente en cuanto a hechos que ocurrieron a las 4 P.M., y que por lo tanto el contrainterrogatorio en cuanto a hechos que ocurrieron esa noche, particularmente al efecto de que el acusado tomó dos o tres tragos entonces, no era propio bajo el artículo 517 del Código de Enjuiciamiento Civil, ed. de 1933, y *Pueblo* v. *Ramírez*, 50 D.R.R. 234.

Es cierto que la regla en esta jurisdicción es que el contrainterrogatorio se limita a los hechos suscitados en el interrogatorio directo. Pero la aplicación de esta regla de ordinario depende de la discreción de la corte sentenciadora, ya que es a veces difícil trazar una línea en cuanto a este punto. Además, a lo sumo, la regla sencillamente significa que la parte examinadora convierte al deponente en su propio testigo si se permite contrainterrogarle sobre un punto completamente diferente al interrogatorio directo. La cuestión es esencialmente una de orden de prueba y tal cuestión necesariamente debe dejarse a la discreción de la corte inferior. VI Wigmore on *Evidence*, 3ra ed., págs. 532–73. No vemos tal abuso de discreción aquí, así como tampoco de qué manera la repregunta perjudicó sustancialmente los dere-

chos del acusado, ya que él mismo testificó que tomó uno o dos tragos aquella noche.

■ El próximo señalamiento es que la corte inferior erró al no permitir al acusado preguntar a Jacinto Ortiz, testigo de la defensa, si sabía si Lacourt había estado en la cárcel por portar armas fuera de los terrenos del malecón. La contención es que esta pregunta era procedente, ya que el fiscal había preguntado a Ortiz en la repregunta si él sabía si Lacourt tenía una licencia para portar armas expedida por la corte de distrito de Mayagüez, a lo que contestó el testigo que no sabía. De acuerdo con el acusado, una contestación afirmativa a esta pregunta tendería a demostrar que Lacourt estaba acostumbrado a portar armas que no pertenecían a su patrono, fuera de los terrenos del malecón, y que por lo tanto podía haber estado portando el revólver .32 que el acusado declaró pertenecía a Lacourt y que el Pueblo dijo pertenecía al acusado. Suponiendo sin decidirlo que este examen redirecto era procedente, ésta no era la manera adecuada de establecer la convicción de Lacourt por portar armas. No encontramos error en lo resuelto por la corte inferior en cuanto a este punto.

■ El próximo error se refiere a la negativa de la corte de distrito a permitir que Benito Pérez Cory, testigo del Pueblo, fuera llamado de nuevo a la silla testifical con el fin de sentar las bases para impugnar su testimonio. El apelante sostiene que el propósito primordial de su petición era demostrar al testigo su declaración jurada ante un oficial del Fondo del Seguro del Estado y de darle una oportunidad de explicar las alegadas diferencias entre esta declaración y su testimonio en el juicio. El apelante tuvo amplia oportunidad de sentar tal base cuando estaba contrainterrogando al testigo. Su petición para que se llamara nuevamente al testigo estaba dirigida a la discreción de la corte inferior. No vemos abuso de tal discreción al negarse la corte a llamar al testigo para este fin, luego de haber declarado varios otros testigos.

■ Además, la cuestión es académica toda vez que la corte inferior admitió el documento, instruyendo al jurado que lo admitía únicamente para impugnar la credibilidad del testigo. El resultado final, si acaso, fué más favorable al acusado que a lo que tenía derecho bajo la ley: se admitió en evidencia a solicitud del acusado una manifestación de un testigo de cargo supuestamente inconsistente sin darle al testigo una amplia oportunidad de explicar las alegadas contradicciones entre ella y su declaración. Véase III Wigmore, supra, pág. 702 *et seq.*

■ Finalmente, se queja el apelante de dos pequeños párrafos en las instrucciones al jurado sobre malicia. Las instrucciones fueron tan largas que su transcripción tomó 48 páginas. El acusado no solicitó instrucciones adicionales ni objetó estos párrafos o ninguna otra parte de las instrucciones. No puede levantar el punto por primera vez en apelación, especialmente cuando los párrafos en cuestión, cuando se leen conjuntamente con otras partes de las instrucciones, exponen razonablemente la ley. *Pueblo* v. *Rodríguez*, 70 D.P.R. 23.

*Las sentencias de la corte de distrito serán confirmadas.*