EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JOSÉ ANTONIO NEGRÓN RODRÍGUEZ, acusado y apelante.

Núm. 15182.—*Sometido:* Abril 7, 1952.—*Resuelto:* Junio 13, 1952.

F. *Hernández Vargas*, abogado del apelante; *Hon. Procurador General Víctor Gutiérrez Franqui (Federico Tilén, Procurador General Interino,* en el alegato) y *J. Rivera Barreras, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR NEGRÓN FERNÁNDEZ emitió la opinión del tribunal.

Ante el Tribunal de Distrito de Puerto Rico, Sección de Bayamón, el aquí apelante fué acusado conjuntamente con Feliciano Pérez Rivera, Alejandro Figueroa Ríos, Ramón Luis Serrano Torres, Inocencio Morales Padilla, Eulogio Morales Nieves, Elmer Rivera Nieves y Antonio Nieves Álvarez de un delito de atentado a la vida. En la acusación se alegó que el día 30 de octubre de 1950, en la calle Georgetti del pueblo de Naranjito, los acusados "ilegal, voluntaria y criminalmente, con malicia, premeditación, deliberación y propósito firme y decidido de dar muerte ilegal al ser humano Juan Rivera Ferreris, Teniente de la Policía Insular de Naranjito, quien se encontraba en el balcón del Cuartel de

la Policía Insular de Naranjito, en la Calle Georgetti, haciendo los acusados uso de rifles y pistolas, armas mortíferas, acometieron al Teniente de la Policía Insular Juan Rivera Ferreris, haciéndole un disparo, sin lograr herirlo."

Celebrado el juicio correspondiente el jurado que entendió en la causa rindió veredicto condenatorio contra el aquí apelante por el delito de atentado a la vida, y veredicto contra cada uno de los siete otros coacusados por el delito de acometimiento grave.

El apelante recibió una sentencia indeterminada de 5 a 10 años de presidio y cada uno de los otros coacusados una sentencia de 1 año de cárcel.

El presente recurso de apelación fué interpuesto por José Antonio Negrón Rodríguez—el coacusado convicto de atentado a la vida—y señala como único error el de haberse negado el juez inferior a corregir el veredicto contra él rendido y sustituirlo por el de acometimiento grave, sentenciándolo a la pena de 5 a 10 años de presidio y no a la de un año de cárcel como a los demás coacusados convictos de acometimiento grave. Pasemos a examinarlo.

La prueba de cargo, que fué la única pasada en el juicio, demostró, en síntesis, que el aquí apelante, en la mañana del 30 de octubre de 1950, llegó a la plaza del pueblo de Naranjito e invitó a varias personas conocidas suyas "a una fiestecita" en su casa. Éstas tomaron la guagua—guiada por el apelante—y se dirigieron hacia el barrio "Higuillar", donde éste vivía. Durante el viaje, dirigiéndose a sus acompañantes, el apelante les dijo: "Muchachos ha llegado la hora de la revolución", "¿ustedes están dispuestos a acompañarme a la Revuelta Nacionalista?" Los "invitados" del apelante llegaron con él hasta su casa en la guagua, pero se quedaron "abajo", diciéndole que no podían "hacer eso", tildándolos entonces el apelante de cobardes. Mientras eso ocurría, Alejandro Figueroa Ríos—otro de los coacusados—desde el garaje les "apuntaba por la ventana, que siempre

estaba alerta pendiente de nosotros, y allí se le zafaron dos balas" de un rifle que portaba.

En la casa estaban los otros coacusados "salcochando plátanos en la cocina y verdura para comer." Allí tenían rifles, uno con una bayoneta calada, y preparaban "como un tubito con mecha." El apelante llenó un maletín con balas y dinamita que sacaron de una caja. Como a las once de la mañana salieron para el pueblo en una de sus guaguas, llevando el maletín de referencia y cuatro rifles—incluyendo el de la bayoneta calada que llevaba el apelante, además de llevar dos pistolas puestas en la cintura "igual que un vaquero". Al abordar la guagua, guiada entonces por el coacusado Feliciano Pérez Rivera, "se dirigieron hacia el pueblo con los rifles y con el maletín con el propósito de matar a los guardias y encargarse del municipio, de la colecturía y del cuartel, porque querían coger todo eso", según manifestó a los "invitados" el aquí apelante cuando les reveló, camino de su casa, el verdadero propósito de su invitación. Aquéllos se quedaron en el lugar hasta las dos y media de la tarde porque el apelante les dijo "Ustedes no se pueden ir para el pueblo hasta que yo baje primero al pueblo", amenazándolos con que "si bajábamos al pueblo nos mataba."

Ya en el pueblo, la guagua, "a una velocidad vertiginosa" pasó por frente al cuartel de la policía, alrededor de las 12:40 P. M., y como a quince o veinte pies de distancia el apelante apuntó y disparó con el rifle que portaba al Teniente de la Policía Juan Rivera Ferreris, quien se hallaba parado en el balcón del Cuartel, sin lograr herirlo. La bala le pasó cerca de la cabeza y fué a dar contra la pared a su lado izquierdo. Éste dió un paso hacia atrás y sacó su revólver haciendo un disparo. La guagua se detuvo como a 150 yardas del cuartel y se bajaron los ocupantes—el apelante y los otros coacusados—con las armas que portaban y el maletín. Caminaron hacia el cuartel y a una distancia como de 60 ó 70 yardas "se apostaron en posición de disparar, para disparar hacia el cuartel", pero luego corrieron para el cerro.

El maletín fué ocupado y contenía bombas de construcción doméstica, dos rollos de alambre eléctrico, balas, dos alicates, un cortafrío y trece cartones de dinamita, según testimonio pericial, el cual comprobó el carácter explosivo de las bombas.

La evidencia material, debidamente identificada, fué admitida por el tribunal.

Ante esos hechos, la conclusión es inevitable: tanto el apelante como los otros coacusados pudieron haber sido convictos todos del delito imputádoles en la acusación, o sea, atentado a la vida. Sin embargo, no obstante la inconsistencia del veredicto de atentado a la vida rendido contra el aquí apelante con los de acometimiento grave rendidos contra los otros coacusados, dicho veredicto es válido y no será alterado porque está ampliamente sostenido por la prueba. Esa es la regla prevaleciente en California, de donde adoptamos nuestro Código de Enjuiciamiento Criminal. *People* v. *Black*, 80 C.A. 605; *People* v. *Richardson*, 83 C.A. 302; *People* v. *O'Neal*,.2 C.A. 2d 551; *People* v. *L'Hommedieu*, 44 C.A. 2d 27; *People* v. *Beck*, 95 C. A. 257; *People* v. *Blackwood*, 35 C.A. 2d 728. Fricke, *California Criminal Procedure*, pág. 311; *Cf. People* v. *Wilson*, 54 C.A. 2d 412; *People* v. *Edwards*, 81 C. A. 2d 655. Y en otras jurisdicciones, como Nueva York, *People* v. *Cohen*, 223 N. Y. 406, 119 N.E. 886. Véanse además *Dunn* v. *United States*, 284 U. S. 390, 76 L. ed. 356; *United States* v. *Bergdoll*, 272 F. 498; *Pilgreen* v. *United States*, 157 F.2d 427; *United States* v. *Meltzer*, 100 F.2d 739.

■ El apelante, en vista de los demás veredictos de acometimiento grave, quiso investigar en el tribunal inferior si el veredicto rendido en su contra por atentado a la vida fué un "veredicto por transacción". Sobre este punto, oigamos al Juez Holmes en *Dunn* v. *United States*, supra: "Que el veredicto puede haber sido el resultado de transacción (*compromise*), o de una equivocación de parte del jurado, es posible. Pero los veredictos no pueden ser alterados

564

mediante especulación o investigación de tales extremos."
*Young* v. *United States*, 168 F.2d 242.

 Estando el veredicto rendido contra el apelante sostenido por la prueba, el mismo no debe ser alterado. El hecho de que el jurado, olvidándose de la ley transmitídale en las instrucciones o inspirado en un equivocado sentido de clemencia se inclinara a favorecer indebidamente a los otros coacusados rindiendo contra ellos veredictos de acometimiento grave, no conlleva la nulidad del rendido contra el apelante ni su rebaja al nivel de los demás.

*La sentencia será confirmada.*