**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Americo DI PIETTO et al., Defendants-Appellants.**

**Nos. 15857–15861, 16038.**

United States Court of Appeals
Seventh Circuit.

May 17, 1968.

Rehearing Denied June 20, 1968.

Robert S. Bailey, Richard LeFevour, Oak Park, Ill., Edward J. Calihan, Jr., John P. Crowley, Chicago, Ill., Bailey & LeFevour, Oak Park, Ill., for appellants.

Thomas A. Foran, U. S. Atty., Gerald Werksman, Asst. U. S. Atty., Edward V. Hanrahan, U. S. Atty., Chicago, Ill., for appellee, John Peter Lulinski, Asst. U. S. Atty., of counsel.

Before SCHNACKENBERG, FAIRCHILD and CUMMINGS, Circuit Judges.

FAIRCHILD, Circuit Judge.

This is an appeal from the conviction of five defendants of conspiring to transport falsely made, forged, altered or counterfeited securities in interstate commerce.[1]

The evidence tended to show the following facts: In May 1961, defendant Santucci stole 148 American Express money orders from a store where they were held for sale to customers. The money orders bore an imprinted signature on behalf of American Express Co., and no additional signature was required on issuance. The words "Not payable for more than one hundred dollars" were printed on them. The spaces for amount, payee, date, and sender's name and address were blank. The money orders were payable at New York.

On May 29, in Franklin Park, Illinois, defendants Di Pietto and Infelice (with the consent and knowledge of Santucci and defendant Mirro) arranged with unindicted co-conspirator Ackerman to pass the money orders. On June 1, Ackerman enlisted the aid of defendant McDonnell, who suggested and later telephoned unindicted and co-conspirator O'Connor in Kansas City. O'Connor agreed to handle the money orders.

Ackerman delivered the money orders to O'Connor in St. Louis. O'Connor took them to Kansas City where he, unindicted co-conspirator Lent, and Lent's wife filled in about 85 of the money orders. Mrs. Lent filled in the sender's name as W. R. Stanley of Chicago and made them payable to Henry L. Stanley. Lent typed in the amount of $100 on each order while O'Connor used a copying machine and Lent's draft cards, discharge papers, etc., to make out false identity papers in the name of Henry L. Stanley.

Lent went to Springfield, Missouri, where he cashed several of the money orders before being arrested. After his arrest Lent called O'Connor and told him what had happened. O'Connor fled to Chicago and Michigan City, Indiana, and

1. 18 U.S.C. § 2314.

was in contact with some of defendants for a time. The remaining money orders were returned to Di Pietto.

The points raised by defendants and our conclusions concerning them are as follows:

I. *Were the money orders, when cashed, "falsely made, forged, altered, or counterfeited"?*

The third paragraph of 18 U.S.C. sec. 2314 prescribes punishment for one who "with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities * * * knowing the same to have been falsely made, forged, altered, or counterfeited * * *."

The contemplated transportation in interstate commerce on which guilt of conspiracy is predicated is the transportation from the place where the money orders would be cashed to New York. In order to cash the money orders, the amount, name and address of sender, and name of payee would have to be, as they in fact were, falsely written on the face of the money orders and the purported endorsement of the payee on the back.

Defendants' first contention is that in this form the money orders were not falsely made, forged, altered, or counterfeited securities.

Defendants rely on Streett v. United States.[2] In that case defendant stole some genuine travelers checks from the purchaser and named payee. The checks were completely filled out including the amount of the checks and the signature of the payee. All that was required for negotiation was countersignature of the payee. The defendant forged the payee's countersignature when he cashed the checks. The indictment charged defendant with transporting falsely made and forged securities in interstate commerce. The court held that because "the travel-er's checks involved were complete genuine securities at the time that they came into the hands of the defendant,"[3] the forgery of the countersignature did not make the check a forged security.

■ With all respect, we question whether *Streett* is correct. A genuine traveler's check without the payee's countersignature is a security under 18 U.S.C. sec. 2311(ff.). It has value to the payee, but no value, for legitimate use, to anyone else. When validly countersigned, it is still a security, but the obligation it represents now runs to someone other than the payee. In the light of the purpose of the statute, it seems at least a reasonable argument that if the countersignature, which, if genuine, alters the rights evidenced by the security, is a forgery, the check is a forged security for the purpose of 18 U.S.C. sec. 2314.[4]

We are aware that in *Streett*, the eighth circuit relied on Prussian v. United States (1931), 282 U.S. 675, 51 S.Ct. 223, 75 L.Ed. 610. The statutes involved in the two cases are different. Under a statute punishing forgery of an obligation of the United States, the Supreme Court held in *Prussian* that a forged endorsement by the purported payee of a government draft did not constitute forgery of the draft.

■ But in any event *Streett* is distinguishable from the case before us. The traveler's checks in *Streett* were, at the time of theft, genuine written evidence of an obligation of American Express to pay a sum of money upon proper presentation of the check. In the case before us, although the signature was genuine, the money orders were not, at the time of theft, evidence of any obligation of American Express. They did not appear to evidence an obligation until the amount and the name of the payee

2. (8th Cir. 1964), 331 F.2d 151.

3. Streett v. United States (8th Cir. 1964), 331 F.2d 151, 157.

4. For critical comment on *Streett*, see La-Buy, Manual on Jury Instructions—Criminal, sec. 24.02, 36 F.R.D. 457, 675.

were fraudulently inserted. Such insertions were forgery.[5]

## II. *Was there prejudicial communication with the jury and was the verdict a product of coercion?*

The jury began deliberations at 3:35 p. m. May 9. They were taken to sleeping quarters at 10:45 p. m., and resumed deliberations at 8:45 a. m. May 10. At 9 a. m. the judge informed counsel in open court that the preceding evening the jury sent a written question as to who had made a telephone call referred to in the testimony. The judge said, "I told them I was unable to furnish any information, if I did at all, until the lawyers reconvened at 9:00 o'clock in the morning." After colloquy, the judge indicated to counsel he would not respond further to the jury's question.

Later in the morning court resumed and the judge announced that the foreman had sent word through the marshal that the jury "apparently are unable to agree at this time." After colloquy, the judge called the jury into court and inquired of the foreman "whether, in your judgment, further deliberation would be productive of a verdict." The foreman replied, "Well, we were unable to reach a decision, sir."

The judge then announced he would repeat an instruction given in the general charge and add another.

The repeated instruction was:

"Any verdict you reach must be unanimous and in your deliberation you should examine the evidence submitted with a proper regard and consideration for the opinions of each other. You should listen to each other's arguments with an open mind."

After repeating the above, the judge said:

"Now with reference to this instruction that I have just read, I am going to give you this following instruction and send you back for additional deliberation:

"The Court, by repeating this last instruction, does not intend nor mean to convey the impression that the jury must reach a decision in this case. You are at liberty not to do so if, after further discussion, any differences of opinion heretofore expressed cannot conscientiously be reconciled one way or the other."

Defense counsel objected to the instructions and moved to discharge the jury.

The judge announced that he was going to the circuit judicial conference, but would be available and that he intended to keep the jury out until 4:30 p. m.

Court resumed at 4 p. m. to receive a verdict. The judge made the following announcement:

"I would like the record to show that at approximately 11:35 the jury sent the following note to the Court:

"'Your Honor: The issue has broken up and discussed and we the jury is still unable to reach a decision. The jury.'

"The deputy marshal, Mr. Joneson, phoned me at the conferences of judges and I directed him to just tell the jury to continue their deliberations. We will file that of record. All right."

The jury was brought in and the foreman said it had reached a verdict. The verdict, finding defendants guilty, was read, and the jury polled.

■ Defendants challenge, as reversible error, the message sent by way of the deputy marshal to the jury "to continue their deliberations". We are convinced beyond a reasonable doubt that the communication of this message by way of the deputy marshal was harmless.[6]

5. Castle v. United States (5th Cir. 1961), 287 F.2d 657, 660; United States v. Nelson (7th Cir. 1960), 273 F.2d 459, 462; Rowley v. United States (8th Cir. 1951), 191 F.2d 949, 950. See 36 Am.Jur.2d 681, Forgery, sec. 1.

6. United States v. Compagna (2d Cir. 1944), 146 F.2d 524, 528; United States v. Hoffa (7th Cir. 1966), 367 F.2d 698, 713, judgment vacated 387 U.S. 231, 87 S. Ct. 1583, 18 L.Ed.2d 738.

■ Defendants also claim that the instructions given when the jury indicated inability to agree were coercive. We do not agree, and find no reason for deeming the verdict a product of coercion.

## III. *Can Ackerman's testimony support the verdict?*

■ Independent witnesses established the initial disappearance of the money orders, and the fact that two were cashed. Lent testified concerning the filling in and cashing. O'Connor did not testify. It is clear that Ackerman supplied the only evidence linking defendants with the theft and cashing.

The district judge properly gave wide latitude for cross-examination and impeachment of Ackerman. His past history is highly unsavory, and he admitted lies, crimes, frauds and the like, as well as difficulties with the law pending at the time of the trial. There is, however, nothing inherently incredible in his testimony concerning the relevant facts. If it is fabrication, he is indeed an unusual expert.

We do not think that the derogatory facts in the record destroyed his credibility as a matter of law.

## IV. *Did prejudicial error occur at trial?*

Defendants allege that several occurrences combined to deprive them of a fair trial. We do not agree. The instances, and our comments, follow:

■ 1. *Judge's interrogation of jury about newspaper articles.*

At the close of the first day of trial (May 3), the judge warned the jury that there might be comment on the trial in the public media, explained the unfairness which would result if such information influenced them, and directed them to avoid reading or listening to the public media concerning the case. He asked them to report promptly any unintentional violation, and said he would ask each juror each day whether he had followed the instruction. Each morning, he asked each juror, by name, and each juror answered he had not read or heard anything.

The May 4 morning papers carried two stories containing prejudicial material, and defense counsel brought them to the attention of the court. The judge inquired of each juror, as above related.

Defendants contend that the manner of questioning put so much pressure on each juror to answer that he had not read anything that no reliance can be placed upon the answers.

We can not say from this record that the judge could not properly believe that the answers were truthful.

■ 2. *References to "burying" O'Connor.*

It was charged and the evidence tended to show that the conspiracy to pass the money orders continued after the arrest of Lent. Ackerman testified that while several defendants were deciding what to do with O'Connor at that point, Mirro recommended "burying" O'Connor because he could put them in the penitentiary. Government counsel referred to this in argument. We agree with the government that the testimony was relevant in proving the continuing conspiracy, and that reference in argument was proper.

Ackerman also testified that on another occasion Mirro pointed out a farm and told him it had been Jack McGurn's private cemetery where he buried the guys he hit and that was the place where O'Connor ought to get buried. The court instructed the jury to disregard the conversation about the place where McGurn buried his hits, but denied a mistrial. We find no error.

■ 3. *Reference by government counsel to lie detector test.*

Defendant McDonnell, an attorney, conducted his own defense. FBI Agent Stephan had interviewed him. On cross-examination, McDonnell asked Stephan if McDonnell had not asked to be given a lie detector test. A government objection was overruled and Stephan said

McDonnell had asked, but Stephan had declined.

On redirect, the government asked: "And Mr. McDonnell wasn't given a lie test because they don't mean anything, isn't that right?" The court sustained an objection and instructed the jury to disregard the question. We find no error.

### ■ 4. *Remark by government counsel.*

Ackerman and Joseph Kalady had been staying in protective custody at the Cook County "witness quarters." Kalady had admitted telling a false story about being a witness to a killing. He was called by defendant Mirro and testified, in effect, that Ackerman had suggested that he tell such story to the authorities so that they might drop some of the charges against Kalady. Defendant McDonnell, on cross-examination, asked "Mr. Kalady, as a matter of fact, you fully expect and have been told that you will be a government witness in other cases, haven't you?" Government counsel said, "I object. Not any more." On objection, the court instructed the jury to disregard the remark, but denied a mistrial.

The defense asserts that the "disavowal of Kalady as a government witness constituted a highly improper comment by the prosecutor on the credibility of the defense witness. * * * " The remark was unnecessary and irrelevant. In the light of Mr. Kalady's somewhat bizarre testimony, however, we conclude that under all the circumstances the remark can not have been prejudicial to defendants.

### ■ 5. *Argument of counsel for Santucci.*

Santucci's counsel argued:

"Don't judge Frank Santucci because his name is Santucci. Don't judge him because he happens to know Mr. Infelice. Don't judge him because he is an Italian or you may suspect he is a crook or a hoodlum or member of the syndicate or a member of the mob."

The other defendants claim that the reference to ethnic background, and to Infelice, deprived them of a fair trial. Infelice had taken the stand and admitted a felony conviction and that his occupation was that of professional gambler.

Santucci's counsel, of course, was suggesting facts which were irrelevant, and reasons for decision which would (as he was contending) be wholly improper. Nothing else in the record touched upon those areas, and we are not persuaded that these remarks induced the jury to consider such factors.

### ■ V. *Santucci's intent with respect to interstate transportation.*

The money orders were payable at New York and in defendants' possession in the Chicago area. Any plan to realize on them would necessarily include interstate transportation. When they were handed to Ackerman, the names and amount had not been inserted, and there had been no forgery. If they were transported to New York in that condition and the forgery perpetrated there, no interstate transportation of a forged security would have occurred.

Ackerman testified that Santucci was present when Ackerman agreed with Di Pietto to handle the money orders on a consignment basis. There was no testimony showing Santucci's knowledge of a selection of Springfield, Missouri or any other particular place in which to cash them.

Apparently the claim is that he must be presumed to have agreed only to a plan that they be transported to New York without alteration, and completed and cashed there. There was no evidence that Santucci placed or knew of any restriction on where the money orders were to be cashed. We think that under the circumstances Santucci is chargeable with an agreement which included the natural and probable methods of achieving the agreed result.

The judgments will be affirmed.