El Pueblo de Puerto Rico, demandante y apelado, *v.* Gabriel Maldonado Dipiní y Alberto de la Rosa Torres, acusados y apelantes.

*Número:* CR-67-125     *Resuelto:* 18 de febrero de 1969

898

*Santos P. Amadeo*, abogado de Alberto de la Rosa Torres; *César Andreu Ribas* y *César Andreu Meguinoff*, abogados de Gabriel Maldonado Dipiní; *Rafael A. Rivera Cruz*, Procurador General, *Peter Ortiz*, Subprocurador General, y *Lolita Nie-*

*ves Franqui, Procuradora General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Contra los apelantes se formuló acusación por el delito de robo en grado de subsiguiente porque en unión a Luis M. Cestau, el 28 de abril de 1960, penetraron en la residencia de Pedro Silva Pabón donde se encontraba su esposa y, armado uno de ellos con un revólver, amenazaron a la Sra. Petra Vélez y al jardinero Narciso Félix Rivera y sustrajeron una cantidad de dinero de la caja de seguridad.

El juicio en este caso comenzó en 5 de junio de 1961. El jurado que entendió en el mismo no logró ponerse de acuerdo. Señalado nuevamente, en el segundo juicio se terminó de presentar la prueba en 29 de mayo de 1962. Luego de varias interrupciones porque el jurado alegaba no podía ponerse de acuerdo o por necesitar material y después de unas 15 horas de deliberación, el jurado encontró a los apelante culpables del delito de robo. Encontró inocente a un tercer coacusado llamado Luis M. Cestau. El veredicto fue por votación de 9 a 3.

Se señaló el 11 de junio de 1962 a las 9:00 A.M. para el acto de pronunciamiento de sentencia pero a moción de la defensa de los acusados, quien informó que se proponía presentar una moción de nuevo juicio, se suspendió ese acto para el 22 de junio de 1962. Posteriormente fue suspendido el acto para el 2 de julio de 1962 porque alegó la defensa que todavía no tenía lista la moción sobre nuevo juicio. No fue hasta el 16 de julio de 1962 que se celebró la vista de la referida moción. Habiéndose inhibido el Hon. Juez Freyre, la misma fue discutida ante el Hon. Juez Moreda y finalmente fue declarada sin lugar el 23 de julio de 1962. Se procedió entonces al acto de pronunciamiento de sentencia. Se condenó al apelante Alberto de la Rosa a una pena de 10 a 15 años de presidio con trabajos forzados. Se impuso

al apelante. Gabriel Maldonado Dipiní, una pena de 15 a 30 años de presidio con trabajos forzados. De la minuta del día 23 de julio de 1962 aparece que a Alberto de la Rosa no se le impuso pena por la infracción al Art. 7 de la Ley de Armas porque el caso "fue archivado en una fecha anterior."

Concluimos que deben confirmarse dichas sentencias por las razones expuestas en la consideración de los apuntamientos de los apelantes que a continuación relacionamos.

1.—Apuntan los apelantes que "Los veredictos rendidos por el jurado contra los acusados-apelantes son nulos, ya que no fueron dictados por unanimidad, como lo requiere la Enmienda Sexta de la Constitución de los Estados Unidos, la cual rige en Puerto Rico, de acuerdo con las doctrinas de los casos de *Balzac* v. *Puerto Rico*, 258 U.S. 298 (1922); *Reid* v. *Covert*, 384 U.S. 1 (1957) [sic—354 U.S. 1 (1957)]; y *Duncan* v. *Louisiana*, resuelto en 20 de mayo de 1968."

■ Este apuntamiento es inmeritorio. Esta contención fue resuelta adversamente al apelante en *Fournier* v. *González*, 80 D.P.R. 262 (1958), y en *Fournier* v. *Gonzalez*, 269 F.2d 26 (1959), *certiorari* denegado 359 U.S. 931 (1959). Además, idéntica cuestión fue planteada en *Cotto Torres* v. *Delgado*, Hábeas Corpus 955, resuelto en 17 de marzo de 1961, en que declaramos sin lugar el auto de habeas corpus, resolución que fue confirmada por la Corte de Apelaciones para el Primer Circuito, en 4 de mayo del mismo año. (*Certiorari* denegado 368 U.S. 944 (1961). Véase también, *Pueblo* v. *Cotto Torres*, 88 D.P.R. 23 (1963).

■ Apuntan los apelantes, además, que el veredicto del jurado debió ser por unanimidad según la norma establecida en *Duncan* v. *Louisiana*, 391 U.S. 145 (1968), la cual es aplicable a Puerto Rico. No tienen razón pues *Duncan*, supra, no sostiene específicamente que la aplicación en los Estados del derecho de juicio por jurado garantizado por la Enmienda Sexta de la Constitución de los Estados Unidos requiera que el veredicto tenga que ser por unanimidad.

Por el contrario, el tribunal en ese caso, en el escolio Núm. 30 de la opinión de mayoría, dijo, refiriéndose, entre otras cosas, al hecho de que en algunos estados el veredicto del jurado puede ser por menos de la unanimidad, que "Nos parece improbable que nuestra decisión de hoy habrá de requerir extensos cambios en el procedimiento criminal estatal." De todos modos, no tenemos que resolver ahora si *Duncan*, supra, es aplicable en esta jurisdicción ya que tiene efecto prospectivo y el juicio en este caso se celebró antes del 20 de mayo de 1968. *De Stefano* v. *Woods*, 392 U.S. 631 (1968).

2.—Señalan los apelantes que fueron privados del derecho a un juicio justo e imparcial garantizado por la 5ta. Enmienda de la Constitución de los Estados Unidos en vista de que el juzgador y sentenciador tuvo una entrevista en privado con un jurado en ausencia de los acusados y de sus respectivos abogados.

El apuntamiento se refiere a un incidente en que el jurado Ramón H. Ortiz procuró una entrevista en la mañana del 28 de mayo, con el juez sentenciador en la oficina de éste, antes de abrirse la sesión de ese día "sin que de ello se informara a la defensa ni al Pueblo, y toda dicha entrevista entre dicho jurado y Vuestro Honor, a puerta cerrada, *mientras los demás señores jurados, y los acusados, sus abogados y Fiscales, ya en sus asientos en Sala, aguardaban por la salida tanto de Vuestro Honor como del jurado aludido.*" (Énfasis nuestro.)

El jurado Ramón H. Ortiz dijo en su declaración jurada que visitó las oficinas del Sr. Juez Freyre para plantearle un problema de su trabajo, ya que lo habían despedido por estar sirviendo de jurado.

En la discusión de esa moción, el Sr. Ernesto Ramírez Rubio declaró que el jurado Ortiz le había dicho que tenía problemas en su trabajo en la imprenta Baldrich e iba a hablar con el juez. El Hon. Juez Freyre fue llamado a

declarar y admitió que en dos o tres ocasiones habló con el jurado Ortiz en su oficina en relación a que a este señor lo iban a despedir de su empleo por estar sirviendo de jurado. Declaró que con motivo de eso, se comunicó con el representante de Fomento Cooperativo para que suspendieran cualquier investigación hasta que el jurado Ortiz terminara sus funciones de jurado, de manera que pudiera estar tranquilo al oir la prueba del caso, pero que en ningún momento habló con el Sr. Ortiz sobre los méritos del caso. El jurado Sr. Purcell declaró que nunca vio al jurado Ortiz entrar o salir de la oficina del Sr. Freyre de manera que ese hecho no influyó en su veredicto. El jurado Ramón H. Ortiz, en su declaración ante el tribunal, dijo que entró a la oficina del Sr. Freyre para pedirle que intercediera para que una investigación que se hacía en su lugar de trabajo se suspendiera hasta que él—Ortiz—terminara su labor como jurado. Luego entró otra vez porque había sido despedido de su trabajo y quería consultar si eso era legal.

Del récord no surge que en el momento en que los apelantes alegan que sucedió la entrevista, se produjera objeción alguna de parte de ellos, aun cuando surge de los autos que ellos estaban en Sala y sabían de esa entrevista y *aguardaban por la salida tanto del juez como del jurado aludido*. De todas maneras quedó plenamente establecido que la entrevista privada entre el jurado Ortiz y el Hon. Juez Freyre no tuvo nada que ver con los méritos del caso y que se trataba de una cuestión personal del jurado.

Aunque es cierto que las comunicaciones privadas entre los miembros del jurado y terceras personas o testigos o el oficial a cargo están absolutamente prohibidas e invalidan el veredicto, no es menos cierto que dicha norma no es aplicable cuando las circunstancias demuestran, como en este caso, que la comunicación entre el jurado Ortiz y el juez sentenciador se refería a un asunto personal de aquél que nada tenía que ver con ningún aspecto del caso de manera

que no pudo perjudicar a los apelantes. *Mattox* v. *United States*, 146 U.S. 140 (1892); *United States* v. *Compagna*, 146 F.2d 524, 528 (2d Cir. 1944). En *United States* v. *Woodner*, 317 F.2d 649–652 (2d Cir. 1963), se dijo que una conferencia privada de dos jurados con el juez sentenciador no justificaba presumir que fue perjudicial al acusado en ausencia de que se demuestre con claridad que en efecto le fue perjudicial. Véase, además, *Bacino* v. *United States*, 316 F.2d 11, 14 (10th Cir. 1963). A pesar de tener conocimiento de la entrevista en cuestión, la defensa no planteó cuestión alguna con motivo de la misma en ningún momento durante el juicio. En *Pueblo* v. *Emmanuelli*, 67 D.P.R. 667, 670 (1947), dijimos que al surgir una circunstancia de esa naturaleza el acusado no debe permanecer callado y esperar a la terminación del caso para luego, en apelación, si el veredicto le es adverso, señalar dicha anormalidad como error.

Arguyen los apelantes que:

■ (3) "El veredicto y la sentencia recaídos contra los acusados-apelantes son nulos, ya que el veredicto del jurado fue el producto de la coacción ejercida sobre los jurados por el juez juzgador y sentenciador."

Este apuntamiento carece de mérito. Del récord surge que la primera vez que el jurado bajó a las 7:00 P.M.—se había retirado a deliberar a las 5:05 P.M. del día 29 de mayo de 1962—fue con motivo de ir "a comer algo." Regresaron a las 9:00 P.M. e inmediatamente bajaron a las 12 de la medianoche e informaron no haber llegado a veredicto. Luego del juez sugerirle que podían irse a descansar y volver a deliberar al otro día, varios de los jurados se manifestaron en el sentido de seguir deliberando durante la noche. Procedió entonces el juez a enviarles café con bocadillos en vista de la hora avanzada. A las 2:07 A.M. bajaron nuevamente e informaron al tribunal no haber llegado a un acuerdo. Es en este momento que el Juez Freyre les indicó en síntesis

que se trataba de un caso laborioso; que tanto los acusados como la sociedad tenían derecho a que el caso se resolviera. Les hizo claro que eso le tocaba al jurado y que lo tenían que resolver "de la manera como mejor ustedes entiendan que de la prueba y nada más que de la prueba debe resolverse este caso." Uno de los jurados tenía duda sobre evidencia circunstancial y pidió instrucciones sobre eso, a lo que el juez accedió. Indicó éste que iba a disponer que se fueran a dormir para seguir deliberando el próximo día porque entendía que el caso era difícil y requería esfuerzo adicional de parte del jurado en llegar a un acuerdo, *sin importar cuál fuera ese acuerdo.*

En este momento se produjo una excepción del apelante Maldonado Dipiní por entender que lo dicho por el juez podía interpretarse por el jurado "que hasta que no se rinda un veredicto en una forma u otra no han de ser excusados por su Señoría."

El próximo día—30 de mayo de 1962—regresó el jurado del hotel a las 10:20 A.M. y subió inmediatamente a deliberar. Regresaron a las 12:32 P.M. e informaron no poder ponerse de acuerdo. El juez se sostuvo en su posición de que se requería esfuerzo adicional y procedió entonces a enviarles a almorzar. A planteamientos del jurado Purcell, el juez dijo que no era cuestión de complacer, sino de responsabilidad. Les volvió a repetir que tanto el Estado, como los acusados, tenían derecho a que se ventilara el caso, los acusados porque pasaban por la tortura de estar sometidos a un proceso y el Estado porque arrostraba gastos cuantiosos; era cuestión de armonizar criterios; decidir a base de la prueba si los iban a absolver porque no cometieron el delito, o si creían lo contrario. Eso era enteramente de su exclusiva libertad.

A la 1:45 P.M. regresaron de almorzar y subieron al salón de deliberaciones. A las 3:20 P.M. regresaron a pedir papel y lápiz y subieron otra vez. Finalmente, a las 6:50

P.M. regresaron a la Sala e informaron haber llegado a un veredicto de culpabilidad en cuanto a dos de los acusados y a uno de no culpable en cuanto al acusado Luis M. Cestau.

De lo expuesto se desprende que el veredicto del jurado se produjo a las 5 horas y 5 minutos después de la última amonestación por parte del juez. Es razonable inferir que no fue ocasionado dicho veredicto por la amonestación del juez. En el caso citado por los apelantes, *Jenkins* v. *United States*, 380 U.S. 445 (1965), es de notar que luego de dos horas de deliberación, el jurado envió una nota al juez en el sentido de que no podían ponerse de acuerdo *debido a insuficiencia de prueba*. El juez les comunicó en Sala que tenían que llegar a un veredicto. Se resolvió que bajo las circunstancias de aquel caso, las manifestaciones del juez tuvieron un efecto coercitivo. Pero dicho pronunciamiento no es aplicable al caso de autos donde el juez sentenciador en ningún momento les indicó que tenían que llegar a un veredicto ni sus manifestaciones tiene el alcance que les atribuyen los apelantes.

En la vista que se celebró para discutir la moción sobre nuevo juicio todos los jurados declararon al efecto de que no se habían sentido presionados o coaccionados por las manifestaciones del Juez Freyre y que su veredicto fue a base de la evidencia que desfiló en el juicio y esto lo comprueba el hecho de que dicho veredicto no se produjo inmediatamente después de la última manifestación del juez sentenciador sino 5 horas después. De todas maneras el tiempo en que un jurado va a permanecer deliberando depende de la discreción del juez. *United States* v. *Minieri*, 303 F.2d 550, 556 (2d Cir. 1962). En *United States* v. *Olweiss*, 138 F.2d 798, 800–801 (2d Cir. 1943), *certiorari* denegado 321 U.S. 744 (1944), el jurado regresó luego de una deliberación de dos horas y anunció que la discrepancia surgida era muy grande y no había oportunidad de llegar a un acuerdo. Se encontró que no hubo coacción en la siguiente instrucción cuando el

juez los mandó a que siguieran deliberando: "Pueden usar todo el día de mañana, y el siguiente si así lo desean." En *DeVault* v. *United States*, 338 F.2d 179, 182 (10th Cir. 1964), se sostuvo la posición del juez que mantuvo al jurado deliberando durante 13 horas. Ese caso se basó en el de *Mills* v. *Tinsley*, 314 F.2d 311 (10th Cir. 1963), *certiorari* denegado 374 U.S. 847 (1963), en el cual se sostuvo que el juez no abusó de su discreción al mantener al jurado deliberando durante 31 horas a pesar de que en dos ocasiones éste le indicó que no podía ponerse de acuerdo y en ambas ocasiones el juez le pidió que siguiera deliberando luego de darle instrucciones tipo "Allen." (1)

El tribunal en *Mills*, supra, dijo que:

"No es al jurado a quien le corresponde determinar la duración de su deliberación, ya que esa es función del juez en el ejercicio de su sana discreción. No es extraño en forma alguna, que luego de un jurado anunciarle al juez estar dividido y sin oportunidad de ponerse de acuerdo regrese al salón de deliberaciones y vuelva a Sala con un veredicto. La experiencia demuestra que no es el jurado el mejor juez para decidir si pueden llegar a un veredicto. En la mayoría de los casos para que doce personas [o nueve en los casos de veredicto por mayoría como es en Puerto Rico] se pongan de acuerdo es necesario dar consideración cuidadosa a la ley y a la evidencia, y luego discutir los distintos puntos de vista de los miembros del jurado. Es este el tipo de deliberación seria que se contempla en los juicios por jurado. Un juez de experiencia, en la mayoría de los casos, es el más indicado para decir si el jurado le ha dado consideración suficiente a un caso. Siendo así, la ley le impone el deber, dentro de su discreción judicial, de determinar si al jurado no le es posible ponerse de acuerdo en cuanto a un veredicto."

Véanse, además, *Pueblo* v. *Berdecia*, 59 D.P.R. 318 (1941); *United States* v. *Di Pietto*, 396 F.2d 283 (7th Cir. 1968); y *Commonwealth* v. *Ross*, 152 A.2d 788 (Penn. 1959).

---

(1)*Allen* v. *United States*, 164 U.S. 492 (1896).

El cuarto apuntamiento de los apelantes es el siguiente:

4.—"Que cometió error el tribunal sentenciador al no decretar con lugar la moción de suspensión radicada por la defensa—motivada por publicidad perjudicial al apelante— infringiendo así su derecho constitucional a un juicio justo ante un jurado imparcial."

Se basa este apuntamiento en que (1) unos seis días antes del señalado para la celebración del juicio, o sea, el 24 de abril de 1962 el periódico "El Imparcial" publicó "Acusan Tronquista y Dueño Club por Muerte de Jayuya." En el texto de dicha información se decía que Gabriel Maldonado Dipiní, alias "Willy", fue detenido y acusado por asesinato en primer grado, portación y posesión ilegal de armas. Se decía, además, que tenía varias causas pendientes ante los tribunales de justicia. (2) En la edición del 28 de abril de 1962 se informaba que los fiscales y los agentes policiacos "se movían diligentes . . . tratando de darle los últimos toques al expediente que dio base al arresto de Gabriel Maldonado Dipiní conocido por "Willy Motto . . . en el caso de Jayuya." (3) Los periódicos "San Juan Star", "El Mundo" y "Island Times", también publicaron artículos relacionados con los apelantes y fueron sometidos dichos artículos en evidencia.

La publicidad en este caso no es de la magnitud, de la penetración intensa y de la adversa influence decisiva que convirtió el juicio en *Sheppard* v. *Maxwell*, 384 U.S. 333 (1966), virtualmente en un circo y que justificó la revocación de la sentencia en dicho caso. Tampoco se llevó a cabo en este caso la televisión repetida del interrogatorio del acusado por el alguacil celebrado en la cárcel durante el cual aquél admitió haber realizado el robo de un banco, un secuestro y un asesinato no obstante lo cual se negó una moción para el traslado del caso, actuación que dio lugar a la revocación de la sentencia en *Rideau* v. *Louisiana*, 373

U.S. 723 (1963). Ni ocurrió aquí como en *Estes* v. *Texas*, 381 U.S. 532 (1965), en que la revocación de la sentencia fundada en ausencia del debido proceso de ley, se basó en que (1) hubo publicidad masiva antes del juicio; (2) se denegó una moción para prohibir la televisión, radio y fotografías por la prensa; (3) la vista de dicha moción se llevó a cabo en presencia de los testigos y jurados prospectivos y fue televisada, radiodifundida y fotografiada para la prensa; (4) se le dio gran publicidad al panel de jurados original, al juez, al peticionario y al abogado; (5) cuatro de los jurados habían oído todos esos programas de audiovisión; (6) se televisaron los argumentos orales al jurado así como el acto de veredicto y su entrega al juez; y (7) se permitió tomar cintas de visión sin sonido durante todo el proceso.

En el caso de autos, la publicidad fue en el sentido de que al acusado se le había arrestado como supuesto actor del asesinato de Jayuya. Esto se publicó una semana antes del juicio y los apelantes tuvieron amplia oportunidad de examinar al jurado que había de intervenir en el juicio. Aunque no tenemos el beneficio de una transcripción de los incidentes del "voir dire", sin embargo, en la discusión de la moción de nuevo juicio testificaron no haber sido influenciados por ninguna cuestión extraña a los méritos del caso. Todos declararon que su veredicto respondió única y exclusivamente al examen de la prueba desfilada. Como en el caso de autos, el hecho aislado de la publicidad no constituye demostración de prejuicio, en ausencia de prueba de que en efecto el jurado estuviere prejuiciado como resultado de la publicidad. *Beck* v. *Washington*, 369 U.S. 541 (1962). En *Rideau*, supra, se estableció que recae sobre cada acusado el peso de establecer afirmativamente que ha sido privado, por tal publicidad, de su derecho a ser juzgado por un jurado imparcial. En el caso ante nos no se adujo prueba alguna de tal perjuicio. Aquí la desinsaculación del jurado tomó dos días completos. No hubo abuso de discreción al

denegar el juez sentenciador la moción de suspensión. Véase, además, *United States* v. *Medlin*, 353 F.2d 789 (6th Cir. 1965). El *certiorari* solicitado en este caso del Tribunal Supremo de los Estados Unidos fue denegado el mismo día que se resolvió *Sheppard*, supra, en 6 de junio de 1966, 384 U.S. 973. Se denegó, además, una moción de reconsideración en 10 de octubre de 1966, 385 U.S. 889.

El apelante llama nuestra atención con insistencia a ciertos comentarios sobre publicidad perjudicial que hicimos en *Pueblo* v. *Dumas*, 82 D.P.R. 416, 465 (1961), aunque reconoce que las circunstancias en dicho caso eran muy distintas a las del caso ante nos. No sólo eran las circunstancias distintas en aquel caso sino que en éste mediaron otras que justificaban concluir que la publicidad en cuestión en nada influyó al jurado en cuanto al veredicto condenatorio a que llegó, tales como (a) el hecho de que la publicidad se refería a otras gestiones del apelante Maldonado Dipiní no relacionadas con el delito que se trataba en este caso; (b) el proceso había sido objeto de muchos suspensiones desde el juicio anterior; (c) los jurados informaron que al llegar a su conclusión condenatoria no se tomó en cuenta ni se le dio peso alguno a la publicidad en cuestión; y (d) la publicidad en cuestión no fue del grado e intensidad que en otros casos se ha considerado indebida y perjudicial por ser en tal grado excesiva que privaran a los apelantes de la "serenidad judicial y calma a que tenían derecho" o que crearan un estado mental en los jurados que le hiciese imposible actuar con imparcialidad, circunstancia ésta que correspondía a los apelantes establecer lo cual no hicieron.

Concluimos, por lo tanto, que el tribunal de instancia no incidió al denegar la moción de suspensión en cuestión.

5.—Alegan los apelantes que el tribunal incidió, en perjuicio del derecho del acusado a ser juzgado imparcialmente, al no inhibirse voluntariamente el Hon. Juez Freyre y Montero. Además, que fue error de parte del Hon. Juez Carreira

Más al denegar la moción de inhibición del acusado Maldonado Dipiní; que en todo caso fue error perjudicial al acusado el haber permitido el tribunal que esa moción se discutiera al comienzo de la vista del juicio, el día de su señalamiento, en presencia del jurado prospectivo.

Se basa este apuntamiento en que el juez de instancia la semana anterior había determinado causa probable contra el apelante Maldonado Dipiní y otras personas por el delito de escalamiento en primer grado y en que intervino en un caso de atentado a la vida.

Para la fecha de estos juicios, la Regla 63 de las de Procedimiento Civil regía la cuestión de la inhibición de los jueces. Por la Regla 63.1(a) se disponía que "A propia iniciativa, o a solicitud de parte, un juez deberá inhibirse de actuar en un pleito o procedimiento en cualquiera de los casos siguientes: (a) Por estar interesado en su resultado o tener prejuicio o parcialidad hacia cualquiera de las partes o sus abogados."

Bajo la referida Regla, tal prejuicio o parcialidad debe ser *personal* y no *judicial*. Prejuicio personal significa una actitud extra-judicial en su origen y el hecho de que el juez ha intervenido en casos anteriores distintos, en contra de los mismos acusados o en contra de uno de ellos, no es suficiente para demostrar ese prejuicio personal. *Lyons* v. *United States*, 325 F.2d 370, 376 (9th Cir. 1963), *certiorari* denegado 377 U.S. 969 (1964); *Peters* v. *Jamieson*, 397 P.2d 575 (Hawaii 1964); *Barnes* v. *United States*, 241 F.2d 252 (9th Cir. 1956).

No están presentes en este caso las circunstancias que prevalecieron en *Pueblo* v. *Toro Goyco*, 84 D.P.R. 492 (1962), donde determinamos que un juez que investiga los hechos, reune evidencia y determina causa probable, no debe ser el juez que juzga. En el caso de autos, el Juez Freyre había visto dos casos contra el apelante Maldonado Dipiní, cuyos casos eran completamente distintos al de robo; además había

determinado causa probable en un delito de escalamiento, distinto al de autos. En el presente caso no aparece que el Juez Freyre hubiera tenido contacto anterior de índole alguna con la prueba del delito de robo de que se acusó a los apelantes.

■ El hecho que la moción de inhibición se discutiera el mismo día del señalamiento del juicio y en presencia del jurado prospectivo, no fue perjudicial a los apelantes en vista de que dicha moción se radicó en el momento mismo de ser llamado el caso para juicio y la defensa no utilizó los remedios para impedir que el jurado prospectivo estuviera presente en la discusión de esa moción.

6.—Se invita nuestra atención al alegado error de que el veredicto de culpabilidad del jurado por votación de 9 a 3 en el caso de los apelantes, y el de no culpable por la misma votación en el caso de Cestau, fueron veredictos por transacción.

■ Aducen los apelantes que la prueba señaló a Cestau Moreno como el único de los tres asaltantes que no tenía antifaz y sin embargo fue el único que el jurado encontró inocente. Por esto concluyen que el veredicto fue por transacción. En los autos no hay el menor indicio de que el veredicto rendido haya sido obtenido mediante transacción.

Lo cierto es que Don Narciso Félix Rivera y Doña Petra Vélez de Silva, los únicos testigos presenciales de los hechos, no pudieron identificar a Luis Cestau Moreno, el tercer acusado, como el hombre que acompañaba a Maldonado Dipiní y a de la Rosa el día de los hechos. Sin embargo, identificaron plenamente a los apelantes. Con base en esta prueba y la otra que desfiló, el jurado pudo concluir como concluyó que Maldonado Dipiní y de la Rosa eran culpables del delito de robo y que a Cestau Moreno debía absolvérsele. No vemos por qué por actuarse en esa forma pueda alegarse con razón que los veredictos rendidos fue el resultado de una transac-

ción. *Pueblo* v. *Vélez*, 77 D.P.R. 817 (1955). Cf. *Pueblo* v. *Negrón*, 73 D.P.R. 559 (1952). No se cometió el sexto error.

■ 7.—Finalmente sostienen los apelantes que el veredicto del jurado es contrario a la prueba desfilada. En apoyo de este apuntamiento arguyen los apelantes, en síntesis, que la identificación de los apelantes como los autores del robo, hechas por los testigos Petra Vélez de Silva y Narciso Félix Rivera, así como el restante testimonio de éstos, no eran creíbles porque (a) admitieron que uno se tapaba la cara con una toalla que sostenía con una mano mientras que otro tenía un pañuelo puesto sobre el puente de la nariz que le cubría ésta y la boca; (b) incurrieron en numerosas contradicciones en cuanto a cómo ocurrieron los hechos, el horario de éstos y el color de distintas cosas tales como el vehículo en que llegaron los autores del robo; (c) la señora Silva no pudo identificar a Cestau Moreno como el tercer participante en el robo aunque testificó que ese tercero no tenía la cara cubierta.

La prueba demuestra que: (a) Rivera testificó que al bajarse de la guagua observó que Maldonado Dipiní y Cestau Moreno no tenían el rostro cubierto. En su examen directo dijo que no pudo identificar al que llevaba un revólver como el apelante de la Rosa pero en contrainterrogatorio testificó que sí identificó a de la Rosa como el que portaba esa arma; que éste se tapó la cara con una toalla y Maldonado Dipiní con un pañuelo al entrar a la casa; (b) la señora Vélez testificó que identificó a Maldonado Dipiní por el físico y a de la Rosa porque lo vio descubierto al entrar a la casa pues se colocó la toalla en la cara luego que la encerraron en un closet de donde ella pudo observar (a través de una leve apertura que pudo lograr de la puerta del closet) cómo los apelantes le robaron unas prendas de su joyero y cómo abrieron la caja de caudales de su marido; (c) aunque es cierto que estos testigos incurrieron en contradicciones en los extremos indicados por los apelantes, el jurado estaba

justificado en creerles no obstante las mismas ya que pudo considerar que se debieron al tiempo transcurrido, las muchas veces que los testigos tuvieron que repetir su versión de lo ocurrido y a la circunstancia muy humana y real de que los testigos de unos hechos precisamente cuando tratan de relatarnos con exactitud y verosímilmente los mismos, pueden variar y contradecirse en cuanto a detalles y la sucesión de ellos.

Concluimos que en el récord hay suficiente prueba que sostiene el veredicto rendido y, por lo tanto, que no se incurrió en el error apuntado. *Pueblo* v. *Nicole,* 71 D.P.R. 866 (1950); *Pueblo* v. *Millán,* 71 D.P.R. 440 (1950).

*En vista de lo expuesto deben confirmarse las sentencias dictadas en este caso contra los apelantes en 23 de julio de 1962.*

El Juez Presidente Señor Luis Negrón Fernández no intervino.